No. 14-1281

IN THE

# United States Court of Appeals

### FOR THE FIRST CIRCUIT

---

NORA M. BARRAFORD, individually and as Executrix of the Estate of Daniel M. Barraford; THE FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST,

*Plaintiffs–Appellants*,

---

KATHERINE LYDON, individually and as Executrix of the Estate of John T. Lydon, Jr.,

*Plaintiff*,

v.

T&N LIMITED, f/k/a T&N PLC, f/k/a TURNER & NEWELL PLC, f/k/a TURNER & NEWELL LIMITED; TAF INTERNATIONAL LIMITED, f/k/a TURNERS ASBESTOS FIBRES LIMITED, f/k/a RAW ASBESTOS DISTRIBUTORS LIMITED,

*Defendants–Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

## BRIEF OF PLAINTIFFS-APPELLANTS NORA M. BARRAFORD AND THE FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST

---

Richard Levin
Rowan D. Wilson
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY  10019
(212) 474-1000

*Attorneys for Plaintiff-Appellant The Federal-Mogul Asbestos Personal Injury Trust*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant The Federal-Mogul Asbestos Personal Injury Trust certifies that it has no corporate parent and that no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF THE CASE.................................................................2

STATEMENT OF FACTS ....................................................................3

I.      BACKGROUND: ASBESTOS BANKRUPTCIES AND TRUSTS.............3

II.     DANIEL BARRAFORD'S CLAIMS AGAINST T&N .............................11

III.    FEDERAL-MOGUL'S CHAPTER 11 CASE ..............................12

IV.     THE PLAN AND ITS TREATMENT OF THE HERCULES POLICY......14

SUMMARY OF THE ARGUMENT ......................................................20

ARGUMENT ...................................................................................21

I.      STANDARD OF REVIEW .........................................................21

II.     THE BANKRUPTCY CODE AND THE PLAN EXTENDED THE
        STATUTE OF LIMITATIONS....................................................22

        A.      The Automatic Stay, the Discharge and the Extension of Statutes of
                Limitations Work Together, Claim by Claim, To Protect Creditors'
                Rights ...............................................................................22

        B.      A Chapter 11 Plan May Provide Different Discharge Dates for
                Different Classes of Claims.................................................25

        C.      The Plan Defers Discharge of the Asbestos Claims and Allows the
                Trust to Assert Those Claims in the Tort System ...............29

CONCLUSION .................................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*,
  25 B.R. 484 (Bankr. S.D. Ohio 1982) ...............................................28

*Arruda v. Sears*,
  310 F.3d 13 (1st Cir. 2002) .............................................................23

*In re Cardillo*,
  172 B.R. 146 (Bankr. N.D. Ga. 1994) ...............................................27

*Casperone v. Landmark Oil & Gas Corp.*,
  819 F.2d 112 (5th Cir. 1987) ...........................................................36

*In re Charlie Auto Sales, Inc.*,
  336 F.3d 34 (1st Cir. 2003) ..............................................................35

*E. Refractories Co. v. Forty Eight Insulations Inc.*,
  157 F.3d 169 (2d Cir. 1998) .......................................................35, 36

*In re Federal-Mogul Global Inc.*,
  684 F.3d 355 (3d Cir. 2012) ......................................................passim

*Fish Market Nominee Corp. v. Pelofsky*,
  72 F.3d 4 (1st Cir. 1995) .................................................................24

*Genereaux v. Am. Beryllia Corp.*,
  577 F.3d 350 (1st Cir. 2009) ...........................................................21

*In re Grossman's Inc.*,
  607 F.3d 114 (3d Cir. 2010) ......................................................22, 25

*HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*,
  517 F.3d 454 (7th Cir. 2008) ...........................................................10

*Hillis Motors, Inc. v. Haw. Auto. Dealers' Assoc.*,
  997 F.2d 581 (9th Cir. 1993) ......................................................28, 29

*Jama v. Immigration & Customs Enforcement*,
   543 U.S. 335 (2005)................................................................36

*In re Joint E. & S. Dist. Asbestos Litig.*,
   982 F.2d 721 (2d Cir. 1992) ...........................................4, 5, 7

*In re Merchant*,
   958 F.2d 738 (6th Cir. 1994) ...............................................24

*In re Miller*,
   501 B.R. 266 (Bankr. E.D. Pa. 2013) ...................................31

*In re Nardulli & Sons Co.*,
   66 B.R. 871 (Bankr. W.D. Pa. 1986), *aff'd* 836 F.2d 184 (3d Cir. 1988)..........27

*In re Neilsen*,
   443 B.R. 718 (Bankr. W.D. Va. 2011) ..................................27

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 60 (1st Cir. 2013)..............................................21, 22

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984).................................................................8

*In re Nw. Corp.*,
   313 B.R. 595 (Bankr. D. Del. 2004) ......................................34

*In re Parker*,
   334 B.R. 529 (Bankr. D. Mass. 2005) ...................................27

*Patrick v. Rivera-Lopez*,
   708 F.3d 15 (1st Cir. 2013).....................................................21

*In re Pavelich*,
   229 B.R. 777 (B.A.P. 9th Cir. 1999) .....................................31

*In re Pick & Save, Inc.*,
   478 B.R. 110 (Bankr. D.P.R. 2010).......................................22

*In re Pittsburgh Corning*,
   No. 00-22876, 2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013) .................9

iv

*In re Reisher*,
  149 B.R. 372 (Bankr. M.D. Pa. 1992) ................................................29

*Tenn. Student Assistance Corp. v. Hood*,
  541 U.S. 440 (2004) ..........................................................................25

*United States v. Energy Resources Co.*,
  495 U.S. 545 (1990) ..........................................................................26

*United States v. Heisson*,
  217 B.R. 1 (D. Mass. 1997) ..............................................................25

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ...............................................................9

## Statutes & Rules

11 U.S.C. § 102 .....................................................................................26

11 U.S.C. § 108 ................................................................................passim

11 U.S.C. § 362 ................................................................................passim

11 U.S.C. § 365 .......................................................................................8

11 U.S.C. § 524 ................................................................................passim

11 U.S.C. § 727 ................................................................................23, 27

11 U.S.C. § 944 .....................................................................................23

11 U.S.C. § 1123 ................................................................................8, 26

11 U.S.C. § 1141 ..............................................................................passim

11 U.S.C. § 1142 ..............................................................................25, 35

11 U.S.C. § 1228 .....................................................................................23

11 U.S.C. § 1328 .....................................................................................23

28 U.S.C. § 157 .......................................................................................6

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

Fed. R. Civ. P. 8, Committee Notes on Rules—2010 Amendment........................31

Fed. R. Civ. P. 56 ...............................................................................21

Mass. Gen. Laws ch. 229, § 2 ..............................................................12

Mass. Gen. Laws ch. 260, § 2A ............................................................12

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 365.03[3] ....................................................8

8 COLLIER ON BANKRUPTCY ¶ 1141.05 ....................................................25

2 Steven Plitt et al., COUCH ON INSURANCE § 34:25 (3d ed. 2013) .........................7

H.R. Rep. No. 103-835 (1994)...............................................................5

H.R. Rep. No. 95-595 (1977)............................................................25, 26

Bruce W. Akerly & Christopher J. Ozburn, *The Impact of Confirmation and Postconfirmation Remedies: A Practical Guide*, 3 J. BANKR. L. & PRAC. 551 (1994) ....................................................................................28

Samuel L. Bufford, *Chapter 11 Case Management and Delay Reduction: An Empirical Study*, 4 AM. BANKR. INST. L. REV. 85 (1996)...................................10

Stephen J. Carroll et al., RAND Institute for Civil Justice, *Asbestos Litigation* (2005) ........................................................4, 5, 7, 10

Crowell & Moring, Chart 1: Company Name and Year of Bankruptcy Filing (Chronologically) (May 14, 2014)........................................................4

Lloyd Dixon et al., RAND Institute for Civil Justice, *Asbestos Bankruptcy Trusts* (2010)....................................................................5, 6, 7

Lloyd Dixon & Geoffrey McGovern, RAND Institute for Civil Justice, *Asbestos Bankruptcy Trusts and Tort Compensation* (2011)............................3, 4

David A. Lander, *A Review and Analysis of Selected Post-Confirmation Activities in Chapter 11 Reorganizations*, 62 AM. BANKR. L.J. 203 (1988) ......28

Lynn M. LoPucki & Joseph W. Doherty, *The Determination of Professional Fees in Large Bankruptcy Reorganization Cases*, 1 J. EMP. L. STUD. 111 (2004) ..........................................................................................................9

Lynn M. LoPucki, *The Trouble with Chapter 11*, 1993 WIS. L. REV. 729...............9

Stephen J. Lubben, *Corporate Reorganization & Professional Fees*, 82 AM. BANKR. L.J. 77 (2008) ..........................................................................................9

Jeffrey W. Stempel, *Assessing the Coverage Carnage: Asbestos Liability and Insurance After Three Decades of Dispute*, 12 CONN. INS. L.J 349 (2006) ..................................................................................................................9

Andrew M. Thau et al., *Postconfirmation Liquidation Vehicles (Including Liquidating Trusts and Postconfirmation Estates): An Overview*, NORTON J. BANKR. L. & PRAC. (Apr. 2007) ..................................................................10

U.S. Gov't Accountability Office, GAO-11-819, *Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts* ...............4, 6, 7

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(2). The parties are completely diverse, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. On February 25, 2014, the District Court entered a Memorandum and Order granting Defendants' motion for judgment on the pleadings, which it treated as a motion for summary judgment.[1] (Add. 7, 16.) The notice of appeal was filed on March 13, 2014, within 30 days after entry of the District Court's final decision. (A22.)

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The issues presented for review are:

1.    Did the operation of the Bankruptcy Code and of Appellees' confirmed chapter 11 reorganization plan extend the statute of limitations applicable to Appellants' claims so that their action was timely?

---

[1] On May 1, 2012, this action was consolidated, for pre-trial purposes only, with *Lydon et al. v. T&N Limited et al.*, No. 12 Civ. 10014. *See Lydon*, Order Consolidating Matters Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure [Dkt. 20] ("These matters are consolidated for purposes of pre-trial proceedings only. These matters are not consolidated for trial, judgment or rights to appeal."). Therefore, the February 25, 2014 Memorandum and Order, which was a final decision as to *Barraford*, was appealable pursuant to 28 U.S.C. § 1291 without regard to the status of *Lydon*.

a. May a chapter 11 reorganization plan provide for discharge of different classes of claims at different times?

b. If so, did Appellees' chapter 11 reorganization plan defer, rather than grant or deny upon confirmation, the discharge of asbestos personal injury claims against them?

c. If so, for those claims for which a discharge is deferred, does the Bankruptcy Code's automatic stay, which terminates after plan confirmation only upon the grant or denial of discharge, remain in effect to protect the reorganizing debtor?

d. If the reorganizing debtor remains protected by the Bankruptcy Code's automatic stay from the claims for which a discharge is deferred, does the Bankruptcy Code extend the statute of limitations for those claims?

**STATEMENT OF THE CASE**

Plaintiff-Appellant Nora Barraford brought this action in Massachusetts state court on November 22, 2011 for, *inter alia*, personal injury and wrongful death against Defendants-Appellees T&N Limited and TAF International Limited (collectively, "**T&N**"). She acted for herself individually and as executrix of the estate of her late husband Daniel M. Barraford, by her agent

2

The Federal-Mogul Asbestos Personal Injury Trust (the "**Trust**," and collectively with Mrs. Barraford, "**Appellants**"). T&N removed the case to the United States District Court for the District of Massachusetts on January 4, 2012, where it was consolidated, for pre-trial proceedings only, with *Lydon et al. v. T&N Limited et al.*, No. 12 Civ. 10014, a factually similar case filed in Massachusetts state court on the same day as the *Barraford* action.

T&N filed a motion for judgment on the pleadings in the *Barraford* action. The District Court treated the motion as a motion for summary judgment and on February 25, 2014, issued a Memorandum and Order granting the motion. Appellants filed a timely notice of appeal on March 13, 2014. The *Lydon* case proceeded to trial, where the jury found for the plaintiffs. Judgment in that action was entered on June 23, 2014.

## STATEMENT OF FACTS

## I.    BACKGROUND: ASBESTOS BANKRUPTCIES AND TRUSTS

Understanding the history of asbestos litigation in this country is essential to understanding the chapter 11 plan that governs the statute of limitations issue in this case. Litigation arising from asbestos deaths and injuries inundated the country's tort system for decades.[2] Defendants' and plaintiffs' lawyers struggled to

---

[2] By 2002, approximately 730,000 individuals had filed asbestos-related lawsuits. Lloyd Dixon & Geoffrey McGovern, RAND Institute for Civil Justice, *Asbestos Bankruptcy Trusts and Tort Compensation*, at xi (2011), *available at*

develop alternative dispute resolution mechanisms. All of them failed, not only

because of the unmanageable number of cases, but also because of the diseases'

long latency periods. Defendants increasingly turned to the bankruptcy courts as

the only venue that could adequately address the flood of claims and the

uncertainty of future claims.[3] Starting with the *Johns-Manville* case filed in 1982,

over 100 companies with significant asbestos liabilities have filed cases under

chapter 11 of the Bankruptcy Code.[4]

      *Johns-Manville* set the model for resolving asbestos bankruptcy cases.

The *Johns-Manville* reorganization plan created an asbestos personal injury trust

funded with the reorganized company's stock and with insurance policy proceeds

to compensate current and future asbestos claimants. The plan also imposed an

injunction to channel all current and future asbestos claims away from insurers and

---

http://www.rand.org/content/dam/rand/pubs/monographs/2011/
RAND_MG1104.pdf

[3] *See* Crowell & Moring, Chart 1: Company Name and Year of Bankruptcy Filing
(Chronologically) (May 14, 2014), http://www.crowell.com/files/List-of-Asbestos-
Bankruptcy-Cases-Chronological-Order.pdf (accessed July 18, 2014); *see
generally* Stephen J. Carroll et al., RAND Institute for Civil Justice, *Asbestos
Litigation*, at 107-23 (2005), *available at* http://www.rand.org/content/dam/
rand/pubs/monographs/2005/RAND_MG162.pdf

[4] Crowell & Moring, *supra* note 3; Dixon & McGovern, *supra* note 2, at 2, 5; U.S.
Gov't Accountability Office, GAO-11-819, *Asbestos Injury Compensation: The
Role and Administration of Asbestos Trusts* ("**GAO Report**"), at 2 (2011),
*available at* http://www.gao.gov/assets/590/585380.pdf; Carroll et al., *supra*
note 3, at 110-11; *see also In re Joint E. & S. Dist. Asbestos Litig.* ("*Johns-
Manville*"), 982 F.2d 721, 725-26 (2d Cir. 1992).

others and to the trust.[5] With the additional bankruptcy discharge protection that normally accompanies confirmation of a chapter 11 reorganization plan,[6] the use of a trust as the exclusive source of relief for claimants allowed the company to emerge from bankruptcy free from its prepetition liabilities, including any current and future asbestos liabilities.[7]

Congress codified this model in section 524(g).[8] That section authorizes an injunction, in addition to the ordinary discharge injunction, to protect non-debtor third parties such as insurers if the chapter 11 plan creates a trust that owns (or has a right to acquire) at least 50% of the reorganized debtor's equity and becomes the sole source of compensation for asbestos personal injury and wrongful death claims.[9] The injunction channels all asbestos personal injury claims, whether manifested before, during or after the bankruptcy case, to the

---

[5] *See* Carroll et al., *supra* note 3, at 110-11; *Johns-Manville*, 982 F.2d at 726.

[6] 11 U.S.C. § 1141(d). All section references are to sections of the Bankruptcy Code, 11 U.S.C. § ___, unless otherwise specified.

[7] *See id.*

[8] *See* H.R. Rep. No. 103-835, at 40 (1994) ("The parties in the *Manville* case devised a creative solution to help protect the future asbestos claimants, in the form of a trust into which would be placed stock of the emerging debtor company and a portion of future profits, along with contributions from Johns-Manville's insurers. Present, as well as future, asbestos personal injury claimants would bring their actions against the trust."); Lloyd Dixon et al., RAND Institute for Civil Justice, *Asbestos Bankruptcy Trusts*, at 7 (2010), *available at* http://www.rand.org/content/dam/rand/pubs/technical_reports/2010/RAND_TR872.pdf

[9] §§ 524(g)(2)(B)(i)(III), 524(g)(4)(A)(ii)(III).

trust.[10] A plan may also provide additional trust funding, based on the bankruptcy court's estimation of the aggregate amount of present and future asbestos claims that will be asserted against the trust.[11] In most cases, the debtor's general liability insurance policies or their proceeds are transferred to the trust.[12] The trust processes and reviews asbestos claims under Trust Distribution Procedures approved as part of the chapter 11 plan and generally pays claimants according to a matrix or schedule that sets payment amounts based primarily on the severity of the claimant's illness.[13]

Despite bankruptcy courts' best efforts at estimating future asbestos liabilities, the trusts have not been able to pay injured claimants the scheduled amounts they are due.[14] The shortfalls started with the Johns-Manville trust, which

---

[10] *See* § 524(g)(1)(B).

[11] *See* § 524(g)(1)(B)(ii)(V); 28 U.S.C. § 157(b)(2)(B).

[12] *See* Dixon et al., *supra* note 8, at 8.

[13] *See* § 524(g)(2)(B)(ii)(V); GAO Report, *supra* note 4, introduction ("[E]ach trust has trust distribution procedures … that govern its administration and establish the process for assessing and paying claims …."); *see also In re Federal-Mogul Global Inc.*, 684 F.3d 355, 360-61 (3d Cir. 2012) ("[A]ll trusts have Trust Distribution Protocols (TDPs) to govern how claims are processed and compensated. These procedures are approved as part of the bankruptcy reorganization plan ….").

[14] *See* Dixon et al., *supra* note 8, at 21-22 ("In 1995, Manville, which initially paid 100 percent of a claim, renegotiated the payment percentage to 10 percent."); *see also id.* at 21 ("Ever since the reorganization of the Manville Trust, asbestos PI trusts have wrestled with the question of how to pay future claims out of the limited pool of assets. Although the number of current claims is fixed and

began to run out of money after less than four years of operations,[15] and have continued with nearly all subsequent asbestos personal injury trusts.[16] Many trusts pay less than 10% of the scheduled amounts, based on their own estimates of potential future claim amounts, simply because the trusts do not have enough assets to pay the full scheduled amounts.[17] The key to protecting asbestos victims and paying their scheduled amounts is funding the trusts adequately. Insurance proceeds are often one of the largest funding sources, so preserving all available insurance is of paramount importance in protecting current and future claimants.[18]

Insurance policies typically contain anti-assignment provisions, which ordinarily would prevent a reorganizing debtor from assigning its policies to an asbestos personal injury trust.[19] The Bankruptcy Code normally overrides such

---

knowable, there is substantial uncertainty over the number of claims that will be filed in the future.").

[15] *Johns-Manville*, 982 F.2d at 727.

[16] *See* Carroll et al., *supra* note 3, at 114-15.

[17] *See* Dixon et al., *supra* note 8, at 36-39 ("[T]he assets available to some trusts allow them to pay only a very small proportion of the value assigned to the claim."); *see also* GAO Report, *supra* note 4, at 21 ("Most trusts cannot pay the full value of a claim and still maintain sufficient assets to compensate all present and future claimants. As a result, trusts determine a payment percentage, a fraction of the full value that can be paid to present claimants and still maintain sufficient assets for future claims.").

[18] *See In re Federal-Mogul*, 684 F.3d at 360 ("[L]ike the Johns-Manville trust on which they are modeled, asbestos personal injury trusts receive funding from three primary sources: debtor cash, debtor stock, and insurance settlements.").

[19] *See generally* 2 Steven Plitt et al., COUCH ON INSURANCE § 34:25 (3d ed. 2013).

anti-assignment provisions[20] and permits a chapter 11 plan to assume and assign an executory contract if defaults are cured, compensation is paid for losses resulting from any default, and adequate assurance of future performance is provided.[21] The entire contract must be assumed, *cum onere*.[22]

Based on these principles, courts have permitted reorganization plans to assign insurance policies in asbestos cases as long as the plan is "insurance neutral": the assignment must not affect the insurer's rights and obligations, except strictly as a result of the bankruptcy case and the provisions of the Bankruptcy Code.[23] For example, the filing of a bankruptcy petition operates as an automatic stay of the commencement or continuation of any action or proceeding against the debtor and of any other act to collect or recover a prepetition debt.[24] The stay protects insurers from having to defend claim litigation while the bankruptcy case is pending, but at a price. Statutes of limitations that would have expired during the case, which in the ordinary course would give the insurer a defense to liability, are extended by the Bankruptcy Code, so that the automatic stay does not defeat the

---

[20] § 365(f).

[21] §§ 365(b), 1123(a)(5)(B), 1123(b)(2).

[22] *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531-32 (1984); 3 COLLIER ON BANKRUPTCY ¶ 365.03[3] (16th ed. Alan N. Resnick & Henry J. Sommer eds.) (hereinafter "COLLIER").

[23] *See In re Federal-Mogul Global Inc.*, 684 F.3d at 379-80.

[24] § 362(a).

claim.[25] Despite these and other effects of the Bankruptcy Code on the underlying nonbankruptcy law governing insurance policies and tort claims, the courts have determined that insurance policy assignments under a reorganization plan are permitted,[26] even though asbestos bankruptcies (and their automatic stays) may last over ten years.[27]

   To complete a reorganization, a company could remain in bankruptcy until all disputes related to the case, including disputes over allowance of creditors' claims, are resolved. The Bankruptcy Code permits that, but it would impose unnecessary costs. A longer bankruptcy may cost more in professional fees[28] and would delay the reorganizing company's return to the marketplace unencumbered

---

[25] § 108(c).

[26] *See, e.g.*, *In re Federal-Mogul*, 684 F.3d at 379-80; *In re Pittsburgh Corning Corp.*, No. 00-22876, 2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013). The delay might actually work to insurers' benefit. *See* Jeffrey W. Stempel, *Assessing the Coverage Carnage: Asbestos Liability and Insurance After Three Decades of Dispute*, 12 CONN. INS. L.J 349, 424-28 (2006).

[27] *See, e.g.*, *In re W.R. Grace & Co.*, 729 F.3d 311 (3d Cir. 2013) (affirming confirmation of reorganization plan nearly 13 years after bankruptcy filing).

[28] *See* Lynn M. LoPucki & Joseph W. Doherty, *The Determination of Professional Fees in Large Bankruptcy Reorganization Cases*, 1 J. EMP. L. STUD. 111, 128 (2004); *see also* Lynn M. LoPucki, *The Trouble with Chapter 11*, 1993 WIS. L. REV. 729, 729 ("The length of time companies remain in bankruptcy reorganization is critically important. During that time, the business is at risk because management incentives are inappropriate, professional fees accrue at a rapid rate, and business uncertainties increase."). *But see* Stephen J. Lubben, *Corporate Reorganization & Professional Fees*, 82 AM. BANKR. L.J. 77, 80 (2008) (time spent in chapter 11 was not a significant predictor of overall cost once case complexity was fully modeled).

by the distractions and disadvantages of operating under court supervision.[29]

Courts and practitioners have developed means to shorten the time during which a

reorganizing company remains in bankruptcy. A company typically emerges from

bankruptcy under a reorganization plan before all claims litigation is resolved. The

claims resolution continues against a fund set aside to pay claims.[30] This process

for post-confirmation resolution of claims against the debtor is even more

important in an asbestos bankruptcy, because many asbestos-related claims do not

manifest until years after the company files bankruptcy and so cannot be resolved

during the case.

　　　　Federal-Mogul's chapter 11 plan was designed to follow both the

*Johns-Manville*/section 524(g) model and the post-confirmation claims resolution

practice, to resolve all current and future asbestos claims after the company

---

[29] *See* Samuel L. Bufford, *Chapter 11 Case Management and Delay Reduction: An Empirical Study*, 4 AM. BANKR. INST. L. REV. 85, 89 (1996) ("The reduction of delay in chapter 11 cases should be a noncontroversial goal. After all, the uncertainty of conducting business while in chapter 11 is a cloud that looms over both creditors and debtors.").

[30] *See HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, 517 F.3d 454, 456 (7th Cir. 2008) (describing creation of liquidating trust to pursue post-reorganization claims for the benefit of reorganized debtor's creditors); Andrew M. Thau et al., *Postconfirmation Liquidation Vehicles (Including Liquidating Trusts and Postconfirmation Estates): An Overview*, NORTON J. BANKR. L. & PRAC., at 4 (Apr. 2007) ("The establishment of a [post-confirmation liquidation vehicle] helps to speed the confirmation of a Chapter 11 plan by allowing the debtor's operating assets to emerge from Chapter 11 prior to the resolution of the litigation relating to the debtor and the estate and prior to the collection, liquidation, and distribution of estate assets."); Carroll et al., *supra* note 3, at 118-21.

emerged from bankruptcy, and to preserve insurance recovery rights to maximize the insurance proceeds available to the asbestos personal injury trust. Unusual insurance policy provisions and an unusual reorganization plan required an unusual means to accomplish those goals. Those means give rise to the statute of limitations question before this Court.

## II.    DANIEL BARRAFORD'S CLAIMS AGAINST T&N

Daniel Barraford was an employee of Prudential Insurance Company. (A 31; A64.) Mr. Barraford worked there from 1940 until 1981. He served as an electrician and senior engineer during and after the construction of the Prudential Center in Boston, Massachusetts, from the early 1960s through the late 1970s. (*Id.*) While working at the Prudential Center, Mr. Barraford was exposed to, inhaled and ingested dust from asbestos and asbestos-containing products manufactured, sold, supplied or installed by T&N. (A31.) As a result of his exposure, after a decades-long latency period, disease struck. In September 2002, Mr. Barraford was diagnosed with a malignant right pleural mesothelioma. (A34; A64.) He died from the disease one month later. (*Id.*; A220.)

After he died, his widow, Nora Barraford, was appointed the representative and executrix of his estate. In 2004, Mrs. Barraford filed suit against a number of asbestos manufacturers in Massachusetts state court for their roles in causing Mr. Barraford's injury. (A484-514.) That action was settled or dismissed

11

as to all active, non-bankrupt defendants. In that action, Mrs. Barraford did not sue

T&N, which was protected from litigation by the automatic stay in its then-pending

chapter 11 reorganization case.

For reasons explained below, the Trust brought this action against

T&N in Massachusetts state court as agent on behalf of Mrs. Barraford to recover

for, *inter alia*, personal injury, wrongful death and loss of consortium. On January

4, 2012, T&N removed the action to the United States District Court for the

District of Massachusetts on the basis of diversity jurisdiction. (A25-27.)

Appellants agree that the statute of limitations applicable to Mr.

Barraford's claims is three years after accrual. Mass. Gen. Laws ch. 229, § 2;

Mass. Gen. Laws ch. 260, § 2A; *see* Add. 8. Because Mr. Barraford died on

October 23, 2002, the latest date on which the limitations period would have

expired, absent the extension provided by the applicable Bankruptcy Code

provisions, was October 23, 2005, while the Federal-Mogul bankruptcy was

pending.

## III.   FEDERAL-MOGUL'S CHAPTER 11 CASE

On October 1, 2001, Federal-Mogul Global, Inc. and 156 domestic

and foreign affiliates (the "**Debtors**"), including the U.K.-based T&N, filed

voluntary chapter 11 petitions.[31] According to the Disclosure Statement submitted to the bankruptcy court on behalf of T&N, among others, as of the bankruptcy petition date, the Debtors' aggregate liability for borrowed money was approximately $4.3 billion. (A300.) The bankruptcy court estimated that 114,000 asbestos lawsuits were pending in the United States against T&N and its affiliates as of the petition date, and estimated the Debtors' aggregate liability for asbestos-related claims at $9 billion.[32] *See* Findings of Fact and Conclusions of Law Regarding Confirmation of Fourth Amended Joint Plan of Reorganization for Debtors And Debtors-In-Possession (As Modified), *In re Federal-Mogul Global Inc.*, No. 01-10578 (JKF) (Bankr. D. Del. Nov. 8, 2007), ECF No. 13672; *see also* A212-13 ("In excess of 600,000 asbestos-related lawsuits have been filed against the [Federal-Mogul] Debtors since the inception of the asbestos litigation …. at the Petition Date, more than 121,000 actions were pending against T&N ….").

       The Debtors emerged from bankruptcy on December 27, 2007, under a confirmed chapter 11 plan (the "**Plan**"). (A515-688.) The Plan created the Trust under section 524(g) to pay current and future asbestos claims against T&N from Trust assets and income. (Plan Art. IV, A608-29.) The Plan provided for the

---

[31] *In re Federal-Mogul Global, Inc., et al.*, United States Bankruptcy Court for the District of Delaware, Case No. 01-10578.

[32] An earlier estimate based on an actuarial analysis performed on behalf of the Asbestos Claimants Committee projected personal injury claims against T&N at approximately $11 billion. (A337.)

issuance to the Trust of 50.1 million Class B shares of the reorganized Federal-Mogul. (Plan § 8.3.4, A640.) In accordance with the Bankruptcy Code requirement that the Trust own or have a right to acquire at least 50% of the reorganized debtor's equity, the Trust received 42.5% of the shares in consideration for the Trust's assumption of asbestos claims and the remaining 57.5% of the shares in consideration for a subscription agreement obligation of £338 million, payable over 20 years. Reorganized Federal-Mogul immediately assigned to T&N its right to that payment obligation. (Plan §§ 4.5.5, 8.3.4, A611, A640.) An investment firm received an option to acquire all the Class B shares from the Trust for $775 million in cash and a note. (Plan § 8.3.6, A642; Plan Ex. 8.3.6(a), A765-75.) The cash and note proceeds from the option exercise were then the Trust's principal assets to satisfy billions of dollars in asbestos claims.[33]

## IV.    THE PLAN AND ITS TREATMENT OF THE HERCULES POLICY

In 1996, T&N purchased from Curzon Insurance, Ltd., a U.K. law-governed asbestos liability policy known as the "**Hercules Policy**." (A276; Plan §§ 1.1.63, 1.1.116, A529, A535.) The Hercules Policy had a £500 million policy limit that could be accessed only after T&N made liability payments equal to T&N's self-insured retention of £690 million. (Plan §§ 1.1.113, 1.1.122, 4.5.1,

---

[33] The Trust assumed only asbestos personal injury and wrongful death claims, not property damage claims. For convenience, we use "asbestos claims" to refer only to asbestos personal injury and wrongful death claims.

A535, A537, A610.) Curzon reinsured the risk with three reinsurance companies. (A276; Plan §§ 1.1.180, 1.1.181, A543.) T&N estimated that as of 2004 it had spent approximately £387 million on liability. (A375.) T&N would have to satisfy the remainder of the retention limit before the £500 million Hercules Policy proceeds would be available to satisfy asbestos victims' claims.

The Hercules Policy's terms and U.K. law prohibited the Plan from assigning the Hercules Policy to the Trust, as the Plan did with domestic policies, *see In re Federal-Mogul*, 684 F.3d at 382, and as was routinely done in other asbestos chapter 11 cases in which the Bankruptcy Code overrides typical anti-assignment provisions. Instead, the Plan provided that T&N would retain the Policy, incur defense costs, and pay asbestos claims through the remaining amount of the self-insured retention, after which Policy proceeds would be available to pay for T&N's liability to asbestos victims. Since the Hercules Policy could be used only to satisfy liability for claims against T&N, T&N could not make any claims on the Policy if the Plan discharged T&N's liability to asbestos victims. To preserve the Policy's value, the Plan had to provide that T&N would not receive an immediate discharge from its asbestos liabilities, so that claimants could pursue their claims against T&N. (Plan §§ 4.5.6-4.5.8, 4.5.20, A611-13, A622-23.)

Accordingly, the Plan did not provide for a discharge of asbestos claims against T&N immediately upon plan confirmation. Instead, it deferred the

15

discharge of asbestos claims so that they could still be brought against T&N, with the ultimate goal of preserving T&N's ability to fund the Trust by paying future judgments using the proceeds from the Hercules Policy.[34] The Plan gave the Trust sole authority to bring those claims against T&N on the claimants' behalf. (Plan §§ 4.5.7, 4.5.8(a), A612.) The Plan required the Trust to indemnify T&N fully for its expenses to ensure that T&N would not have to incur expenses after bankruptcy defending asbestos claims, including this one. (Plan § 4.4, A609.) If T&N were found liable on a claim before it had reached its self-insured retention under the Hercules Policy, its obligation to pay the Trust the judgment amount would be offset against the Trust's obligation to pay T&N under the stock subscription agreement. T&N's liability for the judgment would reduce the remaining self-insured retention under the Hercules Policy, which was covered by the amount of the stock subscription agreement obligation. (Plan § 4.5.10(a)(i), A614.) Thus, the

---

[34] Plan § 4.5.6, A611, provides:

> On and from the Effective Date until discharge and release under Section 4.5.20 of the Plan, any liability of the Reorganized Hercules-Protected Entities for Asbestos Personal Injury Claims … and any costs and interest due or which may become due in relation thereto shall continue in full ….

Plan § 4.5.20(a)(ii), A622, provides:

> From and after the Hercules Policy Expiry Date … the Reorganized Hercules-Protected Entities shall automatically and without further order of court be discharged and released from any and all liability with respect to Asbestos Personal Injury Claims (whether then existing or at any time in the future coming into existence …).

Plan was set up to maintain access to the Hercules Policy while ensuring that T&N would not incur new asbestos-related liabilities after it emerged from bankruptcy.

Once the Policy's self-insured retention was exhausted, there would be no further setoff. After that, the reinsurers would be required to pay the Trust the judgment amount on T&N's behalf. (Plan § 4.5.7, A612; *see also* A375.) The Policy proceeds would then fund the Trust until the Policy was paid out. The Trust would use the Policy proceeds and its other assets to compensate claimants eligible under the Trust Distribution Procedures ("**TDP**"). (Plan § 4.2.1, A608-09.) Once the Hercules Policy was exhausted, the Trust would assume sole responsibility for any remaining asbestos claims, and T&N would then and only then receive its chapter 11 discharge from asbestos claims. (Plan § 4.5.20(a)(i-ii), A622.)

The Order Confirming Fourth Amended Joint Plan of Reorganization For Debtors And Debtors-In-Possession (As Modified) ("**Confirmation Order**") provided for the appointment of the Trust's three trustees, who would take office on the Plan's Effective Date, the same day the Trust was formed. (A792; A794.) Until its formation, the Trust could have no employees, no offices, no infrastructure and no operations. It could have no claim forms, no mail box and no one to receive or process claims, as required under the TDP, *see, e.g.*, TDP § 6.1, A750 (the Trust "shall prepare suitable and efficient claims materials … for all Asbestos Trust Claims"), and had only limited ability, based on anecdotal

17

information, to identify potentially eligible claimants or bring claims against T&N on their behalf. The Trust began to process claims in August 2010, more than two years after T&N exited bankruptcy. (A833.) Between August 2010 and June 2012, over 340,000 claims were made on the Trust, approximately 50,000 of which were approved as compensable. (*Id.*) Even if the Trust had complete information from all asbestos victims by the Plan's Effective Date, it would not have been realistic for the Trust to bring thousands of claims within 30 days after its formation.

The expected and inevitable time it would take to set up and fund the Trust so that it could assert claims on behalf of asbestos victims created a risk that applicable statutes of limitations would bar otherwise eligible claims against T&N for injuries that had manifested during the chapter 11 case and while the Trust was being set up to receive claims and pursue them against T&N. Section 108(c)(2) alleviated that risk by extending any statutes of limitations that would have expired while the automatic stay was in effect until 30 days after the stay's termination. The Plan ensured that the Trust could still bring claims that arose before the Trust was able to bring them by leaving the automatic stay in place and modifying the stay to allow the Trust to bring individual claims against T&N, in a process that complied with sections 108(c)(2) (statute of limitations extension), 362(c) (automatic stay termination) and 1141(d) (chapter 11 discharge), as explained below.

18

To summarize the Plan's operation: The Trust is appointed as sole agent to bring actions against T&N on behalf of asbestos victims. (Plan §§ 4.5.7, 4.5.8(a), A612.) The reinsurers control the defense. (Plan § 4.5.8(f), A613.) The Trust indemnifies T&N for defense costs. (Plan § 4.4, A609.) If the Trust wins a judgment, T&N satisfies the judgment by a setoff deducted from the amount that the Trust owes T&N under the Trust's stock subscription obligation. (Plan § 4.5.10(a)(i), A614.) The judgment amount reduces the remaining self-insured retention under the Hercules Policy by the same amount. When the Trust, on behalf of asbestos victims, has obtained judgments against T&N for the full amount of the stock subscription obligation, the Hercules Policy self-insured retention will have been exhausted. Any remaining judgments that the Trust wins against T&N must be paid by the reinsurers under the Hercules Policy, up to the Policy limits. (A375.) The Policy payments are deposited into the Trust and available generally for all asbestos victims, not just the victim whose claim resulted in the payment. (Plan § 4.2.1, A608-09.) If and when the Hercules Policy is exhausted, and only then, T&N receives its deferred discharge from asbestos claims. (Plan § 4.5.20, A622-23.) The Trust could not then bring any more claims against T&N. (*Id.*) In short, the Plan provisions at issue here were built around two goals: ensuring that reorganized T&N would not have to pay for any new or ongoing liability for

asbestos claims, and ensuring that the Trust would have access to the Hercules

Policy proceeds so as to compensate T&N's victims as fully as possible.

## SUMMARY OF THE ARGUMENT

The filing of a chapter 11 petition stays any act to collect or recover a

claim against the debtor. That automatic stay terminates upon the grant or denial of

a discharge of a claim. Section 108(c)(2) extends any unexpired nonbankruptcy

statute of limitations for a claim until termination of the stay and then for another

30 days after notice of termination. But until the automatic stay terminates, the

nonbankruptcy statute of limitations for the claim does not expire.

A chapter 11 plan may provide for discharge of different classes of

claims at different times. The automatic stay terminates only for those claims that

are discharged, and section 108(c)(2)'s 30-day limitations period extension then

begins to run for those claims. Until the Plan actually discharges a claim, however,

or the case is closed or dismissed, the automatic stay of any act to collect or

recover that claim continues, and the 30-day final extension for that claim does not

begin to run. The Plan here deferred discharge of asbestos claims against T&N to

allow the Trust, on behalf of the asbestos victims, to bring asbestos claims against

T&N and thereby access the Hercules Policy.

Until T&N receives its discharge from asbestos liability claims—

when the Hercules Policy is exhausted—the automatic stay is modified to permit

20

the Trust to carry out the terms of the Plan by bringing asbestos claims against

T&N. Until the discharge is granted and the automatic stay is terminated, section

108(c)(2)'s statute of limitations extension protects Mr. Barraford's claim against

T&N. Therefore, Mrs. Barraford's and the Trust's action against T&N on her

behalf is timely.

**ARGUMENT**

## I.    STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*.[35] *Genereaux v. Am. Beryllia Corp.*, 577 F.3d 350, 359 (1st Cir. 2009). Summary judgment is appropriate only where, "drawing all reasonable inferences in favor of the non-moving party," *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 60, 66 (1st Cir. 2013), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

---

[35] The final order entered by the district court granted T&N's motion for judgment on the pleadings, but the district court's memorandum opinion treated the motion as though it had been converted to a Rule 56 motion for summary judgment. (Add. 6-8, 16.) The same *de novo* standard of review applies to a district court's grant of a motion for judgment on the pleadings. *Patrick v. Rivera-Lopez*, 708 F.3d 15, 18 (1st Cir. 2013) ("[A] court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment …. [W]e will review the district court's decision de novo.") (quotation omitted).

## II.   THE BANKRUPTCY CODE AND THE PLAN EXTENDED THE STATUTE OF LIMITATIONS

### A.   The Automatic Stay, the Discharge and the Extension of Statutes of Limitations Work Together, Claim by Claim, To Protect Creditors' Rights.

Automatically upon the filing of a bankruptcy petition, section 362(a) stays the commencement or continuation of any action or proceeding against a debtor that could have been brought before the commencement of the bankruptcy case, or to recover a claim against a debtor that arose before the commencement of the bankruptcy case. Mr. Barraford's claims were subject to the automatic stay upon T&N's bankruptcy filing because the claims arose from his exposure before bankruptcy to T&N's asbestos-containing products. *See In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010) (tort claimant had "claim" under the Bankruptcy Code when exposed to asbestos before bankruptcy, even though injury manifested after plan confirmation); *see also In re Pick & Save, Inc.*, 478 B.R. 110, 117-18 (Bankr. D.P.R. 2010) (citing *In re Grossman's, Inc.*). Under section 362(c)(2), the stay continues until the earliest of:

> (A) the time the case is closed;
>
> (B) the time the case is dismissed; or
>
> (C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

22

Ordinarily, a discharge resolves creditors' claims in bankruptcy before a case is closed or dismissed. *See* §§ 524, 727, 944(b), 1141(d), 1228, 1328. To implement the discharge, section 524(a) imposes a discharge injunction, which enjoins a creditor from pursuing a discharged claim after bankruptcy.[36] The discharge injunction takes over when the automatic stay terminates, to protect the reorganized debtor from any effort to collect a discharged debt. §§ 362(c), 524(a); *see Arruda v. Sears*, 310 F.3d 13, 19, 21 (1st Cir. 2002). After a discharge, a statute of limitations is no longer pertinent, because the creditor is enjoined from pursuing the claim, regardless of whether the statute of limitations has run.

If instead the case is closed or dismissed without a general discharge, or if the debtor is denied a discharge of a creditor's claim, then the automatic stay terminates under section 362(c), and the creditor's right to bring a claim against the debtor is revived. Without more, the creditor might have lost that right by the running of the applicable nonbankruptcy statute of limitations while the bankruptcy case was pending. Section 108(c)(2) protects a creditor in that situation by extending a statute of limitations that expires during the bankruptcy case to "30

---

[36] § 524(a)(2) provides:

(a) A discharge in a case under this title— …

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived ….

days after notice of the termination or expiration of the stay under section 362 …

with respect to such claim." The 30-day period runs from notice that the automatic

stay has terminated or expired, rather than from the termination or expiration of the

stay itself, to give the creditor a full 30-day period to take action.

While a discharge has been neither granted nor denied and the case

remains pending, that is, neither closed nor dismissed, the automatic stay

continues.[37] § 362(c). And while the automatic stay continues, section 108(c)(2)'s

extension of the statute of limitations also continues.

By its terms, section 108(c)(2)'s extension of the statute of limitations

"with respect to such claim" applies claim by claim. The automatic stay does as

well: the Bankruptcy Code allows for stay relief as to particular claims. § 362(d);

*see, e.g.*, *Fish Market Nominee Corp. v. Pelofsky*, 72 F.3d 4, 6 (1st Cir. 1995)

("Section 362(a) protects the estate of the debtor from adverse claims unless the

court lifts the stay in particular instances, *see* 11 U.S.C. § 362(d)."). Where a

particular claim is excepted from discharge under section 523 by a final order—

that is, where a discharge is affirmatively denied—the discharge question for that

claim is finally resolved, and the stay terminates as to that claim. *See In re*

*Merchant*, 958 F.2d 738, 742 (6th Cir. 1994). Section 108(c)(2)'s 30-day period

starts to run "with respect to such claim" upon notice of the stay's termination. *See*

---

[37] As T&N acknowledged below, the bankruptcy case is neither closed nor
dismissed. (A108; *see* A846-51.)

24

H.R. Rep. No. 95-595, at 318 (1977) (extension of the automatic stay expires upon

"the exception from discharge of the debts on which the creditor claims"). Under

section 108(c)(2), when a claimant is given notice that the claim has been excepted

from discharge, the claim revives, and the claimant has 30 days to commence an

action on the claim.

### B.    A Chapter 11 Plan May Provide Different Discharge Dates for Different Classes of Claims.

A chapter 11 plan addresses all of the debtor's assets and liabilities.

The court's order confirming the plan is binding on all creditors and equity holders

and on the world, as an *in rem* judgment as to property within the bankruptcy

court's jurisdiction. § 1141(a); *see Tenn. Student Assistance Corp. v. Hood*, 541

U.S. 440, 447 (2004) (discharge is an *in rem* proceeding). Upon confirmation, the

Bankruptcy Code requires that the reorganized "debtor and any entity organized …

for the purpose of carrying out the plan shall carry out the plan." § 1142(a).

The confirmation order also acts as a discharge of claims against the

debtor. The order discharges the debtor from all pre-confirmation debt:

> (d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
>
> > (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title ….

§ 1141(d)(1); *see In re Grossman's*, 607 F.3d at 122; *United States v. Heisson*, 217

B.R. 1, 3 (D. Mass. 1997); *see also* 8 COLLIER ¶ 1141.05. But the Bankruptcy Code

allows the plan or the confirmation order to modify the general rule: debts are

discharged upon confirmation "[e]xcept as otherwise provided … in the plan, or in

the order confirming the plan." § 1141(d)(1).

Section 1123(b)(6) permits a chapter 11 plan to "include any other

appropriate provision not inconsistent with the applicable provisions of this title."

*See United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990). A provision

like the one in the Plan that defers a discharge of some claims is consistent with

section 1141(d)(1), which authorizes exceptions to the general chapter 11

discharge rule. It is consistent with section 524(a), which refers to "a discharge,"

not "the discharge." The reference to "a discharge" in the singular does not, as the

District Court reasoned (Add. 11), suggest otherwise. In the Bankruptcy Code, the

singular includes the plural. §102(7); H.R. Rep. No. 95-595, at 316 (1977) ("[T]he

singular includes the plural. The plural, however, generally does not include the

singular … even when the item in question most often is found in plural quantities,

in order to avoid the confusion possible if both rules of construction applied."). It

is consistent with section 524(a), which imposes the discharge injunction claim by

claim only as to "any debt discharged under section … 1141," not as to all of a

debtor's debts, such as might be the case if there could be only a single discharge.

It is also consistent with section 108(c)(2), which terminates the extension of the

applicable statute of limitations only for particular claims, not for all claims that

26

may be asserted against the debtor. Finally, it is consistent with section 362(c)'s termination of the automatic stay upon "a discharge." Thus, a chapter 11 plan provision discharging different classes of claims at different times is consistent with the applicable provisions of the Bankruptcy Code.

In most confirmed chapter 11 cases, only a single discharge is necessary, so courts are seldom required to consider how a reorganization plan might apply the Bankruptcy Code's flexible approach to discharges. Accordingly, many decisions addressing the automatic stay and discharge in chapter 11 cases discuss only a single discharge. *See, e.g.*, *In re Nardulli & Sons Co.*, 66 B.R. 871, 875-76 (Bankr. W.D. Pa. 1986), *aff'd* 836 F.2d 184 (3d Cir. 1988) (noting that plan confirmation discharged debtor from all dischargeable prepetition debts and therefore that the automatic stay had terminated). Other cases hold that bankruptcy courts do not grant discharges "piecemeal" to debtors. *See, e.g.*, *In re Cardillo*, 172 B.R. 146, 151 (Bankr. N.D. Ga. 1994); *In re Neilsen*, 443 B.R. 718, 723 (Bankr. W.D. Va. 2011); *In re Parker*, 334 B.R. 529, 536 (Bankr. D. Mass. 2005). However, these latter cases are all chapter 7 liquidation cases, in which the Bankruptcy Code provides for a single discharge. *See* § 727(a) ("The court shall grant the debtor a discharge …."). None of these cases undermines the Bankruptcy Code provisions that permit a chapter 11 plan to discharge different classes of claims at different times. The Bankruptcy Code thus accepts staged discharges in a

27

chapter 11 case, which allows the parties to a reorganization case flexibility to address complex situations that could not be addressed by a single discharge—for example, where, as here, a single discharge would not adequately address a plan's purpose or the needs of the reorganization.

Where a reorganization plan provides for discharge of some claims and defers discharge of others, the automatic stay terminates—and section 524's discharge injunction takes over—as to the discharged claims, claim by claim, while the automatic stay continues for the other, un-discharged claims. In most cases, a pervasive discharge is granted when the plan is confirmed, but where specific plan provisions withhold discharge of certain claims until their resolution after confirmation, the exception from the general rule for the timing of the discharge maintains the automatic stay as to those claims. *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 501 (Bankr. S.D. Ohio 1982).[38] Similarly, where a plan "did not grant [the debtor] a discharge but specifically contemplated that any discharge of its debts would occur in the future," the debtor's property

---

[38] *See also* David A. Lander, *A Review and Analysis of Selected Post-Confirmation Activities in Chapter 11 Reorganizations*, 62 AM. BANKR. L.J. 203, 215-16 (1988) (explaining that in *Allied Technology*, "since [the] claim had not yet been discharged and no request for relief from the automatic stay had been filed, the automatic stay remained in effect"); Bruce W. Akerly & Christopher J. Ozburn, *The Impact of Confirmation and Postconfirmation Remedies: A Practical Guide*, 3 J. BANKR. L. & PRAC. 551, 557 (1994) ("[T]he stay may continue in effect for limited postconfirmation purposes, pursuant to the bankruptcy court's specific retention of jurisdiction over certain controversies in the plan.")

28

"remained under the protection of the automatic stay." *Hillis Motors, Inc. v. Haw. Auto. Dealers' Assoc.*, 997 F.2d 581, 589-90 (9th Cir. 1993); *see In re Reisher*, 149 B.R. 372, 374 (Bankr. M.D. Pa. 1992) ("The confirmation order in this case provides for discharge at the completion of the plan …. The Debtors in this case therefore have not been discharged and the automatic stay is therefore present to prohibit creditors from pursuing Debtors."). When discharge of the remaining claims finally occurs, the automatic stay terminates as to those claims upon discharge, but not before, and section 108(c)(2)'s 30-day final extension period then begins to run as to the newly-discharged claims.

### C. The Plan Defers Discharge of the Asbestos Claims and Allows the Trust to Assert Those Claims in the Tort System.

Articles IV and IX of the Plan knitted the Plan together around these Bankruptcy Code provisions. In addition to complying with section 524(g)'s requirements for a channeling injunction, the Plan had to comply with all of the other requirements listed above to provide the Trust with access to the Hercules Policy's full value for the ultimate benefit of asbestos victims.

It had to leave the Hercules Policy with T&N, rather than assign it to the Trust, so as not to violate the Policy's anti-assignment clause. It did. (Plan §§ 1.1.33, 5.1.4, A526, A630 (referencing stipulation that declined to assign Hercules Policy and any recoveries attributable thereto directly to the Trust).)

It had to defer discharge of asbestos claims against T&N so that they could be asserted against T&N to reach the Hercules Policy. It did.  Plan § 4.5.6 continues T&N's asbestos liability in full. (A611-12.) The Confirmation Order's reference to Plan Article IV expressly withholds discharge of these asbestos claims while in clear and direct language granting a discharge of other claims. (A801("[E]xcept as otherwise provided in the Plan (including, without limitation, Article IV of the Plan) or in this Confirmation Order, Confirmation of the Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date …."); *see* Plan § 9.1.1, A661-62 (same).) Likewise, the Plan is careful to note that the broad coverage of its supplemental section 524(g) channeling injunction applies "except as otherwise provided in the Plan." (Plan § 9.3.1, A664-65.)

The District Court concluded that the "imposition of a channeling injunction is a clear indication that a discharge was granted or denied and the automatic stay lifted," because section 524(g) states that a channeling injunction may be entered "to supplement the injunctive effect *of a discharge* under this section" (Add. 12 (District Court's emphasis)). But that misses the intentional symmetry between the discharge and the channeling injunction in the Plan. The Plan discharged claims—just not asbestos claims against T&N—and the channeling injunction did "supplement the injunctive effect" of the discharge. Like

30

the discharge, the channeling injunction expressly carved out asbestos claims against T&N using the same language the discharge provision used: "except as otherwise provided in the Plan." The complementary discharge and supplemental channeling injunction provide further evidence that the Plan was carefully constructed to ensure that any discharge of T&N's asbestos liability is deferred until the Hercules Policy is exhausted.

Were there any doubt that the Plan did not provide an immediate discharge of asbestos claims against T&N, T&N itself has dispelled it. A discharge operates as an injunction against commencing an action on a pre-confirmation claim. § 524(a)(2). It provides a non-waivable defense to an action on such a claim. *In re Miller*, 501 B.R. 266, 272 n.3 (Bankr. E.D. Pa. 2013) ("[T]he federal bankruptcy discharge provides an absolute, nonwaivable defense ….") (quotation omitted); *see also In re Pavelich*, 229 B.R. 777, 781-82 (B.A.P. 9th Cir. 1999) (same); Fed. R. Civ. P. 8, Committee Notes on Rules—2010 Amendment. T&N has asserted over 35 defenses in its answer in this case. (A42-61.) But it has never asserted discharge as a defense. In fact, T&N acknowledged below that the Plan "deferred an immediate discharge of certain claims against Reorganized Hercules-Protected Entities." (A103.)

To free T&N from any risk of future asbestos claims, the Plan had to provide a discharge later, when the Hercules Policy expired, without denying a

31

discharge upon confirmation, which would have exposed T&N to asbestos liability and eliminated the possibility that T&N could receive a full discharge whenever the Hercules Policy was exhausted. It did. (Plan § 4.5.20(a)(ii), A622 ("From and after the Hercules Policy Expiry Date … the Reorganized Hercules-Protected Entities shall automatically and without further order of court be discharged and released from any and all liability with respect to Asbestos Personal Injury Claims ….").) T&N did not argue otherwise below. Nor could it, because if the Plan had denied a discharge of asbestos claims against T&N, it could not also have provided, as it did, a deferred discharge of those same claims if and when the Hercules Policy fully paid out. (*Id.*) In fact, if a discharge had been denied when the Plan was confirmed, T&N would have faced an unlimited number of asbestos lawsuits and, after the Hercules Policy was exhausted, direct and ongoing asbestos liability after exiting bankruptcy—an outcome the entire Plan was structured to prevent.

For the Plan to work, it also had to provide an orderly process for asbestos claims to be asserted against T&N, so that T&N could return to its business without continuing to face the chaotic tangle of asbestos litigation. It did, by channeling all victims' claims to the Trust and requiring that they all be brought by the Trust, which would evaluate and bring claims. (Plan §§ 4.5.7, 4.5.8(a), A612; A804-06.)

32

The Plan had to provide T&N economic protection from future asbestos litigation expenses. It did, by providing for the Trust to indemnify T&N. (Plan §§ 4.4, 4.5.10(a)(i), 8.7, A609, A614, A646; A801-02.) It had to provide a means for T&N to pay out the remaining self-insured retention amount so that T&N, and thus the Trust, could reach the £500 million in Policy proceeds. It did, by permitting T&N to offset its liability on asbestos claims up to the amount of its self-insured retention against the Trust's liability to T&N on the stock subscription agreement. (Plan § 4.5.10, A614-16.)

The Plan also had to protect the Trust against the running of the statute of limitations on asbestos claims that arose before the Trust could bring actions against T&N. It did that as well. If the Confirmation Order had either granted or denied discharge of the asbestos claims against T&N, the automatic stay would have terminated on the Plan's Effective Date as to those claims. § 362(c)(3)(A). Termination of the stay would have started section 108(c)(2)'s 30-day final extension period running. The 30-day period did not run, however, because discharge was explicitly deferred, not granted or denied. (Plan §§ 4.4, 4.5.6, 4.5.20(a)(ii), A609, A611-12, A622.) Thus, the stay did not terminate, and section 108(c)(2)'s extension of statutes of limitations remains in place. Accordingly, Mr. Barraford's claim is timely.

33

If instead, as T&N argues, the automatic stay terminated as to *all* claims against T&N on the Plan's effective date of December 27, 2007, the Plan would have allowed a decades' worth of claims to lapse. The Plan, which gave the Trust the sole authority to bring those claims against T&N, simultaneously would have guaranteed that those claims would be time-barred: within the 30 days between December 27, 2007 and January 28, 2008, the Trust could not as a practical matter have investigated thousands of potential claims against T&N and filed suit against T&N for all valid claims whose statutes of limitations would have otherwise expired. Such a self-contradictory result would be absurd, and courts do not construe statutes, contracts, or plans to reach an absurd result. *In re Nw. Corp.*, 313 B.R. 595, 601 (Bankr. D. Del. 2004) (under Delaware law, "[a]n interpretation that leads to an absurd result is disfavored"); *see* Plan § 11.15, A681 (Plan to be "governed by, and construed and enforced in accordance with, the laws of the State of Delaware …."). Rather, the Plan carefully ensured that it neither granted nor denied a discharge of asbestos claims, precisely to maintain the automatic stay and avoid the inequitable outcome that T&N asserts was written into the Plan. T&N's interpretation, which would require that tens of thousands of claims have been filed within 30 days of the Plan's confirmation, would bar the large backlog of claims whose pursuit had been stayed during the chapter 11 case and until the Trust could pursue them, resulting in a windfall for the reinsurers by substantially delaying, if

34

not preventing, the exhaustion of the self-insured retention and the Trust's access
to the Hercules Policy proceeds.

Finally, the Plan had to permit the Trust to bring the asbestos claims
against T&N, even though the automatic stay had not terminated. It did that as
well. The Plan required the Trust, which was organized for the purpose of carrying
out the Plan, to bring the claims against T&N. (Plan §§ 4.5.8(a), A612 (Trust
authorized to assert claims "in any appropriate forum"); *see* § 1142(a) ("[T]he
debtor and any entity organized or to be organized for the purpose of carrying out
the plan shall carry out the plan ….").) Section 362(d) permits the court to "grant
relief from the stay provided under subsection (a) of this section, such as by
terminating, annulling, modifying, or conditioning such stay," distinguishing
among at least four different kinds of relief, while section 108(c)(2)'s 30-day
extension of the deadline to file claims starts to run only if the stay terminates. The
stay terminates upon grant or denial of discharge, which did not occur here.
Therefore, the Plan's requirement that the Trust bring actions against T&N (*see*
Plan § 4.5.8, A612-13) was a modification, not a termination, solely for the
purpose of carrying out the Plan. *See, e.g.*, *In re Charlie Auto Sales, Inc.*, 336 F.3d
34 (1st Cir. 2003) (modifying, not terminating, the automatic stay to permit certain
actions against debtor to proceed); *E. Refractories Co. v. Forty Eight Insulations
Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (noting that the "Bankruptcy Code

empowers bankruptcy courts to take measures that grant relief from the automatic stay, including 'terminating, annulling, modifying, or conditioning' the stay" and that "[t]hese measures have different operation and effect"); *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 114 (5th Cir. 1987) (noting that the order at issue "by its terms did not terminate or lift the stay" but rather "*modified* the stay"); *see also Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 358 (2005) (Souter, J., dissenting) (acknowledging the Supreme Court's "long-held view that distinct words have distinct meanings"). Accordingly, this action does not violate the stay.

None of these provisions takes away T&N's ability to assert any defense to this or any other asbestos claim, including a statute of limitations defense. ( Plan § 4.5.8(e), A613.) Indeed, T&N asserted over 35 affirmative defenses in its answer, including the statute of limitations. But the ability to assert a defense is not the same as the ability to assert a successful defense, and a limitations defense does not apply while the automatic stay remains in place, as it does here.

## CONCLUSION

In an ordinary chapter 11 case, discharge is a simple matter and need occur only once. The *Federal-Mogul* chapter 11 case required a different solution. That solution is reflected in Article IV of the Plan. Through a deferral of T&N's

36

discharge, the Plan preserves the claims of asbestos victims, to be asserted by the Trust in due course. The Bankruptcy Code is sufficiently flexible to allow it to do so, ensure that the Trust could preserve the value of the Hercules Policy for the benefit of asbestos victims, and ensure that T&N would exit bankruptcy without the specter of ongoing asbestos liability.

July 21, 2014

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

by      /s/ Richard Levin
      Richard Levin (rlevin@cravath.com)
      Rowan D. Wilson (rwilson@cravath.com)

825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff-Appellant
The Federal-Mogul Asbestos Personal
Injury Trust*

**Certificate of Compliance with Rule 32(a)**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,061 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007, in fourteen-point Times New Roman font.

July 21, 2014

CRAVATH, SWAINE & MOORE LLP

by

/s/ Richard Levin
Richard Levin (No. 1163292)


825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff-Appellant The Federal-Mogul Asbestos Personal Injury Trust*

38

## CERTIFICATE OF SERVICE

On this 21st day of July 2014, I electronically filed the **BRIEF OF PLAINTIFFS-APPELLANTS NORA M. BARRAFORD AND THE FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST** in No. 14-1281 using the Court's Case Management/Electronic Case Filing system, which will send a "Notice of Docket Activity" to all counsel listed on the annexed **Service List**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 21, 2014

/s/ Richard Levin
Richard Levin

## Appellate Service List

Timothy John Durken
(tdurken@jagersmith.com)
Steven C. Reingold
(sreingold@jagersmith.com)
Bruce Francis Smith
(bsmith@jagersmith.com)

Jager Smith PC
1 Financial Center
Boston, MA 02111


Edward William Murphy
(tmurphy@morrisonmahoney.com)

Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

*Counsel for Defendants-Appellees T&N Limited and
TAF International Limited*

# ADDENDUM – TABLE OF CONTENTS

ECF No. 77, Memorandum and Order on Motion for Judgment
    on the Pleadings, *Barraford v. T&N Limited*, No. 12-cv-
    10013-FDS (D. Mass), dated February 25, 2014 .............................Add. 1

11 U.S.C. § 102......................................................................................Add. 17

11 U.S.C. § 108......................................................................................Add. 18

11 U.S.C. § 362......................................................................................Add. 19

11 U.S.C. § 365......................................................................................Add. 27

11 U.S.C. § 524......................................................................................Add. 32

11 U.S.C. § 727......................................................................................Add. 39

11 U.S.C. § 944......................................................................................Add. 41

11 U.S.C. § 1123....................................................................................Add. 42

11 U.S.C. § 1141....................................................................................Add. 44

11U.S.C. § 1142.....................................................................................Add. 46

11 U.S.C. § 1228 ...................................................................................Add. 47

11 U.S.C. § 1328....................................................................................Add. 49

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| NORA M. BARRAFORD, ) | |
| Individually and as Executrix of the ) | |
| Estate of DANIEL M. BARRAFORD, by ) | |
| her agent THE FEDERAL-MOGUL ) | Civil Action No. |
| ASBESTOS PERSONAL INJURY TRUST, ) | 12-cv-10013-FDS |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| T&N LIMITED, ) | |
| f/k/a T&N PLC, f/k/a Turner & Newall Plc, ) | |
| and f/k/a Turner & Newall Limited; and ) | |
| TAF INTERNATIONAL LIMITED, ) | |
| f/k/a Turners Asbestos Fibres Limited, and ) | |
| Raw Asbestos Distributors Limited, ) | |
| ) | |
| Defendants. ) | |

_____

| | |
|---|---|
| KATHERINE LYDON, ) | |
| Individually and as Executrix of the ) | |
| Estate of JOHN T. LYDON, JR., by ) | |
| her agent THE FEDERAL-MOGUL ) | Civil Action No. |
| ASBESTOS PERSONAL INJURY TRUST, ) | 12-cv-10014-FDS |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| T&N LIMITED, ) | |
| f/k/a T&N PLC, f/k/a Turner & Newall Plc, ) | |
| and f/k/a Turner & Newall Limited; and ) | |
| TAF INTERNATIONAL LIMITED, ) | |
| f/k/a Turners Asbestos Fibres Limited, and ) | |
| Raw Asbestos Distributors Limited, ) | |
| ) | |
| Defendants. ) | |

_____

Add. 1

### MEMORANDUM AND ORDER ON MOTION FOR JUDGMENT ON
### THE PLEADINGS AS TO CLAIMS OF PLAINTIFF NORA BARRAFORD

**SAYLOR, J.**

This is a product liability action arising out of alleged asbestos exposure.  Jurisdiction is based on diversity of citizenship.  In the 1960s and 1970s, Daniel Barraford worked as an electrician and senior engineer on the construction of the Prudential Center in Boston.  He died in 2002 as a result of mesothelioma.  His widow, Nora Barraford, has brought suit, contending that asbestos products produced by T&N Limited and TAF Limited International caused or contributed to her husband's illness and death.

The complaint asserts six claims:  negligence; breach of express and implied warranties; fraudulent concealment; malicious, willful, wanton, and reckless conduct or gross negligence; wrongful death; and loss of consortium.  Defendants have moved for judgment on the pleadings on the ground that the limitations period has expired.  For the reasons set forth below, the motion will be granted.

## I.    Factual Background

A more extensive discussion of the facts can be found in the Court's September 24, 2013 memorandum and order on defendants' motion for summary judgment.  A brief summary of the facts relevant to this motion are included here, presented in the light most favorable to the non-moving party, the plaintiff.

### A.    The Parties

Plaintiff Nora Barraford is the widow and the executrix of the estate of Daniel Barraford.  She asserts her claim through her agent, the Federal-Mogul Asbestos Personal Injury Trust (the "Trust"), a Delaware statutory trust.

Defendant T&N Limited, formerly known as Turner & Newall Plc, T&N PLC, and Turner & Newall Limited ("T&N"), and defendant TAF International Limited, formerly known as Turners Asbestos Fibres Limited and Raw Asbestos Distributors Limited ("TAF"), are foreign corporations.

**B.    Daniel Barraford**

From the early 1960s to the 1970s, Daniel Barraford worked for the Prudential Insurance Company of America as a senior engineer.  He worked on the construction of the Prudential Center in Boston, Massachusetts, which was completed in 1964.  Various products that contained asbestos were used to construct the buildings, including Sprayed Limpet Asbestos, a product manufactured and sold by defendants.  According to plaintiff, because Daniel Barraford was present on a regular basis at the site while Limpet was being sprayed, he repeatedly inhaled or ingested asbestos fibers.

In September 2002, doctors diagnosed Daniel Barraford with a malignant right pleural mesothelioma.  He died on October 23, 2002, of mesothelioma and related complications. Plaintiff alleges that his disease was caused by his exposure to Limpet and other asbestos-containing products.

**C.    Prior Litigation**

In 1988, T&N and TAF became a member of the Center for Claims Resolutions, Inc., ("CCR"), a consortium of former asbestos manufacturers.[1]  In 1993, the CCR, as defendants' agent, entered into two National Class Action Settlement Agreements.  One of those settlements involved a purported class of persons who had been exposed to asbestos and not yet filed suit.

---

[1] For a discussion of the CCR, see generally *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 599-601 (1997).

3

Daniel Barraford, presumably, was a member of the class, having been allegedly exposed to asbestos in the 1960s. The 1993 settlement agreement, among other things, tolled the limitations period as to the claims of all class members.[2] The district court conditionally certified an opt-out class and appointed as class counsel members of the Ness Motley law firm.

In 1996, the class certification was overturned by the Third Circuit. That action nullified the settlement by its own terms. *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996), *aff'd sub nom. Amchem Prods. v. Windsor*, 521 U.S. 591 (1997). The class was formally decertified in August 1997.

In July 2000, the CCR and the Ness Motley law firm, which had been appointed as class counsel and which apparently represented a large number of plaintiffs, entered into an agreement.[3] Specifically, they agreed to extend the tolling agreement set forth in the 1993 settlement agreement as to "claims represented by [Ness Motley]." The extension was from May 5, 1996, the date of the Third Circuit's decision in *Georgine*, "until such time" as Ness Motley received "written notification from the CCR that the tolling agreement extension is terminated." (Pl. Opp., Ex. D).[4] There is no evidence that Daniel Barraford or his wife were clients of Ness

---

[2] In 1993 and 1995, Ness Motley and the CCR entered into two other agreements that essentially tolled the statute of limitations for Ness Motley clients who made future claims based on non-malignant diseases against members of the CCR and allowed them to participate in Alternative Dispute Resolution with the CCR in the event that the *Georgine* settlement was overturned. (*See* Pl. Opp., Exs. C, M). The agreements do not appear to apply to plaintiff, because Daniel Barraford was diagnosed with a malignant disease, mesothelioma.

[3] Plaintiff also submitted a copy of a letter dated February 16, 2000, from Joseph Rice of Ness Motley to an individual at the CCR that begins, "Enclosed please find a letter I am proposing concerning our long standing tolling agreement." (Pl. Ex. E). The enclosure does not appear to be part of the record.

[4] The 1993 settlement agreement and the July 2000 letter refer to "T&N plc," but not TAF or any predecessor entities. Both parties appear to assume that T&N and TAF should be treated the same for these purposes.

4

Motley in July 2000.[5]

On October 1, 2001, Federal-Mogul Global, Inc., and its subsidiaries, which included T&N and TAF, filed a bankruptcy petition under Chapter 11.  The bankruptcy petition imposed an automatic stay on all pending claims and litigation against Federal-Mogul and its subsidiaries. (Def. Memo., Ex. B-1 at 3).

The following day (October 2, 2001) Federal-Mogul terminated its membership in the CCR.  (Def. Reply, Exs. A, D).  The CCR's governing documents provide as follows:

> Upon suspension or termination of membership and thereafter, a Center Member shall have none of the rights or obligations of a Center Member . . . except that, notwithstanding termination of membership, a Center Member . . . shall continue to have and to honor all of the obligations incurred by it hereunder and under the Original Producer Agreement or on its behalf as a Center Member prior to the effective date of its membership termination . . . .

(Def. Reply, Ex. C at 3-4; *see also* Pl. Opp., Ex. L at 9).

One of the assets owned by T&N and TAF was an insurance policy that had been purchased in 1996 from Curzon Insurance Company, called the "Hercules Policy."  The parties covered by that policy, including defendants, are referred to as "Hercules Protected Entities" ("HPE").  The Hercules Policy indemnified HPEs for asbestos claims in excess of the "Retained Limit."

As noted, Daniel Barraford was diagnosed with mesothelioma in September 2002, and died in October 2002, after the bankruptcy petition was filed.  On October 18, 2004, Nora Barraford, individually and as executrix of the estate of Daniel Barraford, filed an asbestos exposure-related action in Massachusetts Superior Court against thirty defendants.  Her

---

[5] Plaintiff is, however, represented in the present action by the successor to the Ness Motley law firm, now called Motley Rice LLC.

complaint did not name either T&N or TAF as a defendant (both were in bankruptcy) and she did not seek relief from the automatic stay in the bankruptcy court in order to do so.  There is no evidence that either Daniel or Nora Barraford filed a claim in the bankruptcy proceeding.

The Bankruptcy Court approved a plan of reorganization for Federal-Mogul (the "Plan") that, in part, created a process for handling asbestos-related claims.  (Def. Memo., Exs. B, C). Article 4 of the Plan created the Trust.  The Plan provided that each holder of an "Asbestos Personal Injury Claim" was deemed to have assigned to the Trust the proceeds of that claim, discharged all other obligations and liabilities of the HPEs to those holders, and appointed the Trust to assert such a claim, now called a "Debtor HPE Asbestos Claim," against the reorganized HPEs, which include T&N and TAF.  The Plan, after approval by the District Court, became effective December 27, 2007.  (Def. Memo., Ex. E).

### D.   **Procedural History**

On November 22, 2011, the Trust, on behalf of Nora Barraford, filed the present action against defendants T&N and TAF in the Massachusetts Superior Court.  On January 4, 2012, defendants removed the action to this Court on the basis of diversity jurisdiction.

The Court entered a scheduling order on November 5, 2012, pursuant to Fed. R. Civ. P. 16.  The scheduling order imposed deadlines for certain pre-trial events, including an April 12, 2013 deadline for the filing of dispositive motions.  (Dkt. No. 20).  Defendants moved for summary judgment on the ground that plaintiff failed to provide sufficient proof of causation. The Court denied the motion on September 24, 2013.  (Dkt. No. 37).

## II.   **Analysis**

Defendants have now moved for judgment on the pleadings under Fed. R. Civ. P. 12(c).

Although defendants have moved under Rule 12(c), the exhibits attached to their motion and the facts referred to in their supporting memorandum go well beyond the limited allegations of the complaint and answer.  Under Rule 12(d), courts may treat such motions as motions for summary judgment.[6]  The fact that a party has submitted additional materials outside the pleadings is sufficient notice that the motion will be converted to a summary judgment motion.  *Gulf Coast Bank & Trust Co. v. Reder*, 355 F.3d 35, 38 (1st Cir. 2004).  The decision whether to exclude the materials is within the court's discretion.  *Trans–Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).

The parties here have had an opportunity to conduct discovery, and plaintiff has responded in full to defendants' motion, and have presented additional evidence outside the pleadings.  Accordingly, the Court will apply the standard of review applicable to motions for summary judgment under Rule 56.

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply

---

[6] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

"rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

Initially, plaintiff challenges defendants' motion on procedural grounds. Plaintiff contends that because defendants filed this motion long after the April 2013 dispositive motion deadline, the Court should deny it as untimely. This filing is undoubtedly belated; indeed, defendants submitted the motion after the initial pretrial conference, which among other things had the effect of delaying the trial. It would be well within the discretion of this Court simply to deny the motion as untimely. *See Moringlane-Ruiz v. Trujillo-Panisse*, 232 F. App'x 8, 9 (1st Cir. 2007). However, denying the motion on that ground would not resolve the issue; the matter would merely become a question for trial. Such an outcome would be highly inefficient if, as defendants contend, the statute of limitations does in fact bar the suit. Under the circumstances, the Court will decide the motion on the merits.[7]

The parties here agree that the limitations period applicable to plaintiff's claims is three years after accrual of the claim. Mass. Gen. Laws ch. 229, § 2; Mass Gen. Laws ch. 260, § 2A; *Riley v. Presnell*, 409 Mass. 239, 243 (1991). The latest possible date that the limitations period could have begun to run is October 23, 2002, the date of Mr. Barraford's death. Therefore, the limitations period expired on October 23, 2005, at the latest, unless some form of tolling applies.

---

[7] Defendants make the argument that this Court would lack subject-matter jurisdiction over the matter if the claims were barred by the statute of limitations. (Def. Memo. at 6.) That contention is clearly incorrect. It is well-established that the statute of limitations is an affirmative defense. *Fed. Deposit Ins. Corp. v. Cardona*, 723 F.2d 132, 134-35 (1st Cir. 1983). *See Silvestris v. Tantasqua Reg'l Sch. Dist.*, 446 Mass. 756, 766 (2006) (recognizing that the statute of limitations is an affirmative defense that properly is raised in a defendant's answer to the complaint). As such, it "does not affect a court's subject matter jurisdiction." *Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 42 (1st Cir. 2003) (rejecting defendant's argument that limitations period on *Bivens* action had expired thereby relieving district court of subject-matter jurisdiction). *But see Braun v. Yaratz*, 2010 WL 3824109, at *2 (D. Mass. Sept. 24, 2010) (dismissing *pro se* complaint on ground that a district court "lacks subject matter jurisdiction over diversity claims that fall outside the applicable statute of limitations").

Plaintiff contends that the limitations period should be tolled for three reasons:  (1) the Bankruptcy Code imposed a stay that has not been lifted; (2) the July 2000 letter agreement between Ness Motley and the CCR tolled the limitations period; and (3) the claim should be subject to equitable tolling.

A.    **Bankruptcy Code**

When an entity files for bankruptcy, a stay of all legal proceedings automatically goes into effect.  11 U.S.C. § 362.  Absent a court granting relief, the stay remains in effect in a Chapter 11 case until the earliest of three enumerated events:  (1) "the time the case is closed"; (2) "the time the case is dismissed"; or (3) "the time a discharge is granted or denied."  11 U.S.C. § 362(c)(2)(C).

The confirmation of a plan of reorganization under Chapter 11 "discharges the debtor from any debt that arose before the date of such confirmation."  11 U.S.C. § 1141(d)(1)(A).  Usually, such a confirmation also lifts the automatic stay.  *McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 4 (1st Cir. 1991).  In place of the stay, a discharge "operates as an injunction against the continuation or commencement" of actions that arose prior to the date of discharge.  11 U.S.C. § 524(a).  The bankruptcy court may issue additional injunctions to "supplement the injunctive effect of a discharge" in cases where the plan of reorganization establishes a trust that assumes the debtor's liabilities for asbestos-related tort claims in order to deal equitably with claims and future demands.  11 U.S.C. § 524(g).

While the automatic stay is in effect, new claims against the debtor may arise.  To prevent a debtor from avoiding liability for such claims by remaining in bankruptcy until the relevant limitations periods have run, § 108(c) of the Bankruptcy Code provides:

9

Add. 9

> [I]f applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor . . . and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—
>
> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> >
> > (2) 30 days after notice of the termination or expiration of the stay under section 362 . . . of this title . . . with respect to such claim.

11 U.S.C. § 108(c).

Here, defendants filed for bankruptcy on October 1, 2001, triggering the automatic stay. On October 23, 2002, while defendants remained in bankruptcy, Daniel Barraford died. But for the bankruptcy, the three-year limitations period would have expired, at the latest, on October 23, 2005. The bankruptcy court and the district court then confirmed the Plan, effective December 27, 2007, and defendants emerged from bankruptcy. (*See* Def. Memo., Exs. C, D, E).

The parties disagree as to the effect of the confirmation of the Plan on plaintiff's claim.[8] The parties agree that the bankruptcy case was neither closed nor dismissed; the question is whether a discharge was granted or denied. Plaintiff contends that the courts discharged some but not all claims against defendants, and that her asbestos claim is one of the claims that was not discharged. Under that theory, plaintiff asserts that her claim remains subject to the jurisdiction of the bankruptcy court and to the effect of the automatic stay, extending the limitations period through the present day.

Plaintiff reads 11 U.S.C. §§ 108(c) and 362(c)(2) together to provide that an automatic stay will continue "until such time as the *claim* is closed [or] dismissed, or the discharge of the

---

[8] The parties appear to agree that plaintiff's claim here for asbestos-related damages is a "claim" within the meaning of 11 U.S.C. § 101(5).

10

claim is granted or denied." (Pl. Opp. at 15 (emphasis added)). In fact, § 362 does not refer to "claims," but to "cases"; the automatic stay is terminated when the "case" is closed or dismissed (or a discharge is granted or denied). The bankruptcy court grants "a" discharge, not multiple "discharges," to a debtor. *See In re Cardillo*, 172 B.R. 146, 151 (Bankr. N.D. Ga. 1994) ("Bankruptcy courts do not grant or deny 'a discharge' piecemeal and do not grant or deny 'discharges' to a debtor."); *cf. In re Parker*, 334 B.R. 529, 536 (Bankr. D. Mass. 2005).

The reference to a "claim" in § 108(c)(2) cannot be imported wholesale into § 362. That section addresses extensions of limitations periods when the stay has been terminated or expired; it does not address what *causes* the automatic stay to terminate or expire. The automatic stay can be terminated under § 362(d) as to particular claims—for example, in connection with individual requests for relief from the stay. *See* 11 U.S.C. § 362(d). Thus, if a party is granted relief from the automatic stay under § 362(d) to pursue a cause of action against the debtor, then the 30-day time period under § 108(c)(2) would begin to run "with respect to such claim." But § 108(c)(2) does not change the meaning of § 362, or create or extend the stay itself.

It is true that the bankruptcy court here retained jurisdiction over the case. But its jurisdiction was limited to overseeing the implementation of the Plan. And the language of the Plan is not to the contrary, although some discussion is required to explain why. Article 4 of the Plan established the Trust and a process for adjudicating pending and future asbestos-related claims against defendants. (Def. Mem., Ex. C, Art. 4). From the effective date of the Plan until the later of the "Hercules Policy Expiry Date" and the "EL Asbestos Insurance Expiry Date" (essentially, the date when the insurance and other assets run out), defendants retained liability for such claims, termed Asbestos Personal Injury Claims, but with the ability to assert any

11

defenses and with recourse only to certain assets.  *Id.* §§ 4.5.6, 4.5.8, 4.5.10.  The Plan assigned

such claims from injured persons to the Trust, appointed the Trust to assert the claims, and gave

those injured persons a right to make a demand upon the Trust.  *Id.* §§ 4.5.8-10.  The court

entered a channeling injunction to ensure compliance with those procedures pursuant to §

524(g).  (Def. Mem., Ex. E).  *Cf. In re W.R. Grace & Co.*, 475 B.R. 34, 94-108 (D. Del. 2012)

(discussing channeling injunctions).

      Somewhat confusingly, the Plan states that on the later of the Expiry Dates, defendants

will automatically "be *discharged* and released from any and all liability with respect to

Asbestos Personal Injury Claims," for which the Trust will then assume liability.  (Def. Mem.,

Ex. C, § 4.5.20 (emphasis added)).  Plaintiff reads this subsection to mean that her claim has not

been discharged, and that therefore the automatic stay remains in effect.  However, it does not

necessarily follow that because defendants may still be liable, a discharge under the Bankruptcy

Code did not occur in December 2007, when the plan was confirmed.  At the very least, the Plan

both denied a discharge with respect to Debtor HPE Asbestos Claims up to the availability of the

Hercules Policy and granted an automatic discharge with respect to such claims upon the

occurrence of the Hercules Policy Expiry Date.  Under the Plan, no further court order was

necessary for the full discharge of all claims to be in effect.

      The imposition of a channeling injunction is a clear indication that a discharge was

granted or denied and the automatic stay lifted.  Section 524(g) states that "a court that enters an

order confirming a plan of reorganization under chapter 11 may issue, in connection with such

order, an injunction in accordance with this subsection to supplement the injunctive effect *of a

discharge* under this section."  11 U.S.C. § 524(g) (emphasis added).  In other words, an

injunction may be put in place in conjunction with a discharge.  An injunction would be unnecessary if the automatic stay were still in place.  Furthermore, it is noteworthy that plaintiff has not acted as if the automatic stay is still in place; the Trust was not required to, and did not, seek leave of the Bankruptcy Court before filing this action.

In short, as of December 27, 2007, the effective date of the Plan, defendants were granted a discharge and the automatic stay was lifted.  Because the limitations period for plaintiff's claim had expired while defendants were in bankruptcy, plaintiff had thirty days from December 27, 2007, to file suit, under the provisions of the Plan, unless another nonbankruptcy law or agreement extended the period to file.  11 U.S.C. § 108(c)(2).  Plaintiff did not file this action until November 2012, nearly five years after that thirty-day window expired.  Accordingly, the Bankruptcy Code does not operate to save plaintiff's claims from dismissal on statute of limitations grounds.

### B.    Tolling Agreement

If the Bankruptcy Code itself did not extend the time to file, plaintiff contends that the CCR-Ness Motley tolling agreement does.[9]  The agreement is embodied in a July 17, 2000 letter, signed by Michael F. Rooney on behalf of the CCR and attorney Joseph Rice of Ness Motley.  It provides as follows:

> This letter confirms and memorializes that the CCR defendants . . . , by and
> through the CCR, agreed to extend the tolling agreement contained in Section VI

---

[9] Contrary to defendants' reading of plaintiff's opposition (Def. Reply at 7), the Court does not understand plaintiff to be arguing that the 1993 settlement agreement applies here to toll the limitations period.  (*See* Pl. Opp. at 11-13).  Instead, the information appears to be background for interpreting the 2000 tolling agreement.  However, to the extent that plaintiff does assert that the 1993 settlement agreement remains in effect, that is incorrect.  By its own terms, the obligations under the agreement ceased when the Third Circuit, affirmed by the Supreme Court, overturned the judgment approving the stipulation.  (*See* Pl. Opp., Ex. B at 102-03).  *See Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996) *aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).

13

of the Stipulation of Settlement as to claims represented by [Ness Motley] from May 5, 1996, the date of Georgine v. Amchem Products, Inc., 83 F.3d 610 (3rd Cir. 1996).  This letter further confirms and memorializes that this agreement to extend the tolling agreement continues until such time as [Ness Motley] receives written notification from the CCR that the tolling agreement extension is terminated.

(Pl. Opp., Ex. D).  The agreement as a whole is brief.  It does not specify which "claims" Ness Motley represented.  And it does not address the effect of an individual member's withdrawal from the CCR.[10]

The phrase "claims represented by [Ness Motley]" is unclear at best.  Attorneys represent clients, not claims.  Neither Nora nor Daniel Barraford was a client of Ness Motley in July 2000, or for that matter at any point between May 1996 and July 2000.  Under the 1993 settlement and the *Georgine* district court's class-certification decision, Ness Motley attorneys were class counsel representing a class of persons with future claims—which would appear to include the Barrafords.  *See Georgine*, 83 F.3d at 616, 619.  But as of 1996, when that settlement was overturned, and 1997, when that class was decertified, Ness Motley no longer represented a class of persons.  At that time, the firm only represented certain specific individual clients, which did not include either Nora nor Daniel Barraford.   At most, Ness Motley could enter into a tolling agreement only as to their own clients, not as to the no-longer-existing class.  Put simply, that law firm had no authority to act on behalf of the Barrafords in July 2000.

The letter does not indicate the effect of a defendant's withdrawal from the CCR.[11]  The

---

[10] The task of the Court in resolving these ambiguities is made more difficult because the parties do not suggest which state's law should be applied to interpret the agreement.  However, it suffices for present purposes to apply generally-accepted principles of contract law.

[11] The February 16, 2000 letter from attorney Rice to the CCR about the "long standing tolling agreement" states that he will "contact the withdrawing members of the CCR," "ask them if they wish to continue the tolling or should [he] deem it terminated as to those defendants," and "then take legal action . . . as we deem appropriate."  (Pl. Opp., Ex. E).  Although defendants here were not the withdrawing members referred to in the letter, this language

14

governing document for the CCR provides grounds for terminating membership, and states as follows:

> Upon termination of membership and thereafter, a Participating Producer shall have none of the rights or obligations of a member of the Center . . . .  However, notwithstanding termination of membership, a Participating Producer shall continue to have and to honor all of the obligations incurred by it hereunder or on its behalf as a member prior to the effective date of its membership termination, including any retroactive adjustments of its percentage shares of liability payments and allocated expenses . . . .

(Pl. Opp., Ex. L).  It is arguable that the tolling agreement, to the extent it exists, is an "obligation" of defendants incurred "on [their] behalf as a member."  But, as noted, the tolling agreement did not cover the Barrafords.  And defendants here withdrew from the CCR in October 2001, before the wrongful-death claim had even accrued.  Furthermore, the use of the word "incur," which has a financial connotation, and the examples of financial obligations to the CCR, suggest that only those types of obligations and not all contracts will continue.  It is at the very least doubtful whether the tolling agreement, if any, survived defendants withdrawal from the CCR.  In any event, there is no tolling agreement extending the limitations period as to plaintiff's claims.

## C.    Equitable Tolling

Finally, plaintiff contends that applying the statute of limitations here would be inequitable because defendants were aware, when they sought bankruptcy protection, that many persons in her situation would be delayed in pursuing their claims.  (Pl. Opp. at 23-24).  She therefore urges the Court to apply principles of equitable estoppel to preclude defendants from asserting a statute of limitations defense.

---

also suggests that the tolling agreement as to defendants' did not survive their later withdrawal.

15

The doctrine of equitable tolling extends deadlines "if a plaintiff exercising reasonable diligence could not have discovered information essential to the suit." *Bernier v. Upjohn Co.*, 144 F.3d 178, 180 (1st Cir. 1998) (*citing Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615 (1997)). It operates to prevent "results contrary to good conscience and fair dealing." *McLearn v. Hill*, 276 Mass. 519, 524 (1931). That said, "[t]he law does not regard estoppels with favor, nor extend them beyond the requirements of the transactions in which they originate." *Boston & Albany Railroad v. Reardon*, 226 Mass. 286, 291 (1917).

Here, the evidence demonstrates that Nora Barraford was aware of the basic underlying facts of her claim by October 23, 2002, at the latest. Indeed, she filed an asbestos-related lawsuit in state court against other parties out of the same core set of facts in 2004. While she could not have filed a suit against T&N and TAF at that time, due to the bankruptcy, she has presented no evidence that defendants misled her to prevent her from filing suit, or that she was otherwise prevented from timely doing so when defendants emerged from bankruptcy.

Accordingly, the doctrine of equitable tolling will not be employed to extend the limitations period for plaintiff's claims.

## III. Conclusion

For the foregoing reasons, defendants' motion for judgment on the pleadings is GRANTED.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: February 25, 2014                United States District Judge

---

**11 USC 102: Rules of construction**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 1-GENERAL PROVISIONS
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **Amendments**
    **Effective Date**

---

# §102. Rules of construction

In this title-
    (1) "after notice and a hearing", or a similar phrase-
      (A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but
      (B) authorizes an act without an actual hearing if such notice is given properly and if-
        (i) such a hearing is not requested timely by a party in interest; or
        (ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act;

    (2) "claim against the debtor" includes claim against property of the debtor;
    (3) "includes" and "including" are not limiting;
    (4) "may not" is prohibitive, and not permissive;
    (5) "or" is not exclusive;
    (6) "order for relief" means entry of an order for relief;
    (7) the singular includes the plural;
    (8) a definition, contained in a section of this title that refers to another section of this title, does not, for the purpose of such reference, affect the meaning of a term used in such other section; and
    (9) "United States trustee" includes a designee of the United States trustee.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2554 ; Pub. L. 98–353, title III, §422, July 10, 1984, 98 Stat. 369 ; Pub. L. 99–554, title II, §202, Oct. 27, 1986, 100 Stat. 3097 .)

Add. 17

**11 USC 108: Extension of time**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 1-GENERAL PROVISIONS
**Jump To:**
    <u>**Source Credit**</u>
    <u>**Miscellaneous**</u>
    <u>**Amendments**</u>
    <u>**Effective Date**</u>

## §108. Extension of time

(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of-

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of-

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) 60 days after the order for relief.

(c) Except as provided in section 524 of this title, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor, or against an individual with respect to which such individual is protected under <u>section 1201 or 1301 of this title</u>, and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of-

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) 30 days after notice of the termination or expiration of the stay under section 362, 922, 1201, or 1301 of this title, as the case may be, with respect to such claim.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2556 ; Pub. L. 98–353, title III, §424, July 10, 1984, 98 Stat. 369 ; Pub. L. 99–554, title II, §257(b), Oct. 27, 1986, 100 Stat. 3114 ; Pub. L. 109–8, title XII, §1203, Apr. 20, 2005, 119 Stat. 193 .)

Add. 18

**11 USC 362: Automatic stay**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 3-CASE ADMINISTRATION
    SUBCHAPTER IV-ADMINISTRATIVE POWERS
**Jump To:**
    **<u>Source Credit</u>**
    **<u>Miscellaneous</u>**
    **<u>References In Text</u>**
    **<u>Amendments</u>**
    **<u>Effective Date</u>**

## §362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of-

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay-

(1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

(2) under subsection (a)-

(A) of the commencement or continuation of a civil action or proceeding-

(i) for the establishment of paternity;

(ii) for the establishment or modification of an order for domestic support obligations;

(iii) concerning child custody or visitation;

(iv) for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or

(v) regarding domestic violence;

(B) of the collection of a domestic support obligation from property that is not property of the estate;

(C) with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

(D) of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, as specified in section 466(a)(16) of the Social Security Act;

(E) of the reporting of overdue support owed by a parent to any consumer reporting agency as specified in section 466 (a)(7) of the Social Security Act;

(F) of the interception of a tax refund, as specified in sections 464 and 466(a)(3) of the Social Security Act or under an analogous State law; or

(G) of the enforcement of a medical obligation, as specified under title IV of the Social Security Act;

Add. 19

(3) under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

[(5) Repealed. Pub. L. 105–277, div. I, title VI, §603(1), Oct. 21, 1998, 112 Stat. 2681–866 ;]

(6) under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts;

(7) under subsection (a) of this section, of the exercise by a repo participant or financial participant of any contractual right (as defined in section 559) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(8) under subsection (a) of this section, of the commencement of any action by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the National Housing Act and covers property, or combinations of property, consisting of five or more living units;

(9) under subsection (a), of-

(A) an audit by a governmental unit to determine tax liability;

(B) the issuance to the debtor by a governmental unit of a notice of tax deficiency;

(C) a demand for tax returns; or

(D) the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

(10) under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property;

(11) under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument;

(12) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under chapter 537 of title 46 or section 109(h) of title 49, or under applicable State law;

(13) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing facility held by the Secretary of Commerce under chapter 537 of title 46;

(14) under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

(15) under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution;

(16) under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act;

(17) under subsection (a) of this section, of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any

Add. 20

termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(18) under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition;

(19) under subsection (a), of withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer-

(A) to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986; or

(B) a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

(20) under subsection (a), of any act to enforce any lien against or security interest in real property following entry of the order under subsection (d)(4) as to such real property in any prior case under this title, for a period of 2 years after the date of the entry of such an order, except that the debtor, in a subsequent case under this title, may move for relief from such order based upon changed circumstances or for other good cause shown, after notice and a hearing;

(21) under subsection (a), of any act to enforce any lien against or security interest in real property-

(A) if the debtor is ineligible under section 109(g) to be a debtor in a case under this title; or

(B) if the case under this title was filed in violation of a bankruptcy court order in a prior case under this title prohibiting the debtor from being a debtor in another case under this title;

(22) subject to subsection (l), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor;

(23) subject to subsection (m), under subsection (a)(3), of an eviction action that seeks possession of the residential property in which the debtor resides as a tenant under a lease or rental agreement based on endangerment of such property or the illegal use of controlled substances on such property, but only if the lessor files with the court, and serves upon the debtor, a certification under penalty of perjury that such an eviction action has been filed, or that the debtor, during the 30-day period preceding the date of the filing of the certification, has endangered property or illegally used or allowed to be used a controlled substance on the property;

(24) under subsection (a), of any transfer that is not avoidable under section 544 and that is not avoidable under section 549;

(25) under subsection (a), of-

(A) the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

(B) the enforcement of an order or decision, other than for monetary sanctions, obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power; or

(C) any act taken by such securities self regulatory organization to delist, delete, or refuse to permit quotation of any stock that does not meet applicable regulatory requirements;

(26) under subsection (a), of the setoff under applicable nonbankruptcy law of an income tax refund, by a governmental unit, with respect to a taxable period that ended before the date of the order for relief against an income tax liability for a taxable period that also ended before the date of the order for relief, except that in any case in which the setoff of an income tax refund is not permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of a tax liability, the governmental unit may hold the refund pending the resolution of the action, unless the court, on the motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection (within the meaning of section 361) for the secured claim of such authority in the setoff under section 506(a);

(27) under subsection (a) of this section, of the exercise by a master netting agreement participant of any contractual right (as defined in section 555, 556, 559, or 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right (as defined in section 555, 556, 559, or 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue; and

(28) under subsection (a), of the exclusion by the Secretary of Health and Human Services of the debtor from

Add. 21

participation in the medicare program or any other Federal health care program (as defined in section 1128B(f) of the Social Security Act pursuant to title XI or XVIII of such Act).

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989.

(c) Except as provided in subsections (d), (e), (f), and (h) of this section-

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

(2) the stay of any other act under subsection (a) of this section continues until the earliest of-

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;

(3) if a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b)-

(A) the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

(B) on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed; and

(C) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)-

(i) as to all creditors, if-

(I) more than 1 previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was pending within the preceding 1-year period;

(II) a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1-year period, after the debtor failed to-

(aa) file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney);

(bb) provide adequate protection as ordered by the court; or

(cc) perform the terms of a plan confirmed by the court; or

(III) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded-

(aa) if a case under chapter 7, with a discharge; or

(bb) if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; and

(ii) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor; and

(4)(A)(i) if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b), the stay under subsection (a) shall not go into effect upon the filing of the later case; and

(ii) on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

(B) if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

(C) a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order allowing the stay to go into effect; and

(D) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)-

(i) as to all creditors if-

(I) 2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period;

Add. 22

(II) a previous case under this title in which the individual was a debtor was dismissed within the time period stated in this paragraph after the debtor failed to file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney), failed to provide adequate protection as ordered by the court, or failed to perform the terms of a plan confirmed by the court; or

(III) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under this title, or any other reason to conclude that the later case will not be concluded, if a case under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; or

(ii) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, such action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if-

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization;

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later-

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that-

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

(4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either-

(A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

(B) multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

(e)(1) Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

(2) Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless-

(A) a final decision is rendered by the court during the 60-day period beginning on the date of the request; or

(B) such 60-day period is extended-
    (i) by agreement of all parties in interest; or
    (ii) by the court for such specific period of time as the court finds is required for good cause, as described in findings made by the court.

    (f) Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (a) of this section as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section.
    (g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section-
    (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
    (2) the party opposing such relief has the burden of proof on all other issues.

    (h)(1) In a case in which the debtor is an individual, the stay provided by subsection (a) is terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim, or subject to an unexpired lease, and such personal property shall no longer be property of the estate if the debtor fails within the applicable time set by section 521(a)(2)-
    (A) to file timely any statement of intention required under section 521(a)(2) with respect to such personal property or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to section 722, enter into an agreement of the kind specified in section 524(c) applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to section 365(p) if the trustee does not do so, as applicable; and
    (B) to take timely the action specified in such statement, as it may be amended before expiration of the period for taking action, unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree to the reaffirmation on such terms.

    (2) Paragraph (1) does not apply if the court determines, on the motion of the trustee filed before the expiration of the applicable time set by section 521(a)(2), after notice and a hearing, that such personal property is of consequential value or benefit to the estate, and orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee. If the court does not so determine, the stay provided by subsection (a) shall terminate upon the conclusion of the hearing on the motion.
    (i) If a case commenced under chapter 7, 11, or 13 is dismissed due to the creation of a debt repayment plan, for purposes of subsection (c)(3), any subsequent case commenced by the debtor under any such chapter shall not be presumed to be filed not in good faith.
    (j) On request of a party in interest, the court shall issue an order under subsection (c) confirming that the automatic stay has been terminated.
    (k)(1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.
    (2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.
    (l)(1) Except as otherwise provided in this subsection, subsection (b)(22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that-
    (A) under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered; and
    (B) the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

    (2) If, within the 30-day period after the filing of the bankruptcy petition, the debtor (or an adult dependent of the debtor) complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankruptcy law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).
    (3)(A) If the lessor files an objection to any certification filed by the debtor under paragraph (1) or (2), and serves such objection upon the debtor, the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the certification filed by the debtor under paragraph (1) or (2) is true.
    (B) If the court upholds the objection of the lessor filed under subparagraph (A)-
    (i) subsection (b)(22) shall apply immediately and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

Add. 24

(ii) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's objection.

(4) If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)-
    (A) subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and
    (B) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating the absence of a filed certification and the applicability of the exception to the stay under subsection (b)(22).

(5)(A) Where a judgment for possession of residential property in which the debtor resides as a tenant under a lease or rental agreement has been obtained by the lessor, the debtor shall so indicate on the bankruptcy petition and shall provide the name and address of the lessor that obtained that pre-petition judgment on the petition and on any certification filed under this subsection.
(B) The form of certification filed with the petition, as specified in this subsection, shall provide for the debtor to certify, and the debtor shall certify-
    (i) whether a judgment for possession of residential rental housing in which the debtor resides has been obtained against the debtor before the date of the filing of the petition; and
    (ii) whether the debtor is claiming under paragraph (1) that under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment of possession was entered, and has made the appropriate deposit with the court.

(C) The standard forms (electronic and otherwise) used in a bankruptcy proceeding shall be amended to reflect the requirements of this subsection.
(D) The clerk of the court shall arrange for the prompt transmittal of the rent deposited in accordance with paragraph (1)(B) to the lessor.
(m)(1) Except as otherwise provided in this subsection, subsection (b)(23) shall apply on the date that is 15 days after the date on which the lessor files and serves a certification described in subsection (b)(23).
(2)(A) If the debtor files with the court an objection to the truth or legal sufficiency of the certification described in subsection (b)(23) and serves such objection upon the lessor, subsection (b)(23) shall not apply, unless ordered to apply by the court under this subsection.
(B) If the debtor files and serves the objection under subparagraph (A), the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the situation giving rise to the lessor's certification under paragraph (1) existed or has been remedied.
(C) If the debtor can demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied, the stay provided under subsection (a)(3) shall remain in effect until the termination of the stay under this section.
(D) If the debtor cannot demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied-
    (i) relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to proceed with the eviction; and
    (ii) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's certification.

(3) If the debtor fails to file, within 15 days, an objection under paragraph (2)(A)-
    (A) subsection (b)(23) shall apply immediately upon such failure and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and
    (B) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating such failure.

(n)(1) Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor-
    (A) is a debtor in a small business case pending at the time the petition is filed;
    (B) was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;
    (C) was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition; or
    (D) is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

Add. 25

(2) Paragraph (1) does not apply–

(A) to an involuntary case involving no collusion by the debtor with creditors; or

(B) to the filing of a petition if–

(i) the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed; and

(ii) it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

(o) The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or (27) of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2570 ; Pub. L. 97–222, §3, July 27, 1982, 96 Stat. 235 ; Pub. L. 98–353, title III, §§304, 363(b), 392, 441, July 10, 1984, 98 Stat. 352 , 363, 365, 371; Pub. L. 99–509, title V, §5001(a), Oct. 21, 1986, 100 Stat. 1911 ; Pub. L. 99–554, title II, §§257(j), 283(d), Oct. 27, 1986, 100 Stat. 3115 , 3116; Pub. L. 101–311, title I, §102, title II, §202, June 25, 1990, 104 Stat. 267 , 269; Pub. L. 101–508, title III, §3007(a)(1), Nov. 5, 1990, 104 Stat. 1388–28 ; Pub. L. 103–394, title I, §§101, 116, title II, §§204(a), 218(b), title III, §304(b), title IV, §401, title V, §501(b)(2), (d)(7), Oct. 22, 1994, 108 Stat. 4107 , 4119, 4122, 4128, 4132, 4141, 4142, 4144; Pub. L. 105–277, div. I, title VI, §603, Oct. 21, 1998, 112 Stat. 2681–886 ; Pub. L. 109–8, title I, §106(f), title II, §§214, 224(b), title III, §§302, 303, 305(1), 311, 320, title IV, §§401(b), 441, 444, title VII, §§709, 718, title IX, §907(d), (o)(1), (2), title XI, §1106, title XII, §1225, Apr. 20, 2005, 119 Stat. 41 , 54, 64, 75, 77, 79, 84, 94, 104, 114, 117, 127, 131, 176, 181, 182, 192, 199; Pub. L. 109–304, §17(b)(1), Oct. 6, 2006, 120 Stat. 1706 ; Pub. L. 109–390, §5(a)(2), Dec. 12, 2006, 120 Stat. 2696 ; Pub. L. 111–327, §2(a)(12), Dec. 22, 2010, 124 Stat. 3558 .)

Add. 26

**11 USC 365: Executory contracts and unexpired leases**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 3-CASE ADMINISTRATION
    SUBCHAPTER IV-ADMINISTRATIVE POWERS
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **Amendments**
    **Effective Date**

## §365. Executory contracts and unexpired leases

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to-

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

(3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance-

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

(4) Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease.

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment; or

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the

Add. 27

benefit of the debtor, or to issue a security of the debtor; or
   (3) such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

   (d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.
   (2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.
   (3) The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.
   (4)(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of—
   (i) the date that is 120 days after the date of the order for relief; or
   (ii) the date of the entry of an order confirming a plan.

   (B)(i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.
   (ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.
   (5) The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.
   (e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—
   (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
   (B) the commencement of a case under this title; or
   (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

   (2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
   (A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
   (ii) such party does not consent to such assumption or assignment; or
   (B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

   (f)(1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
   (2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
   (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
   (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

(g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease-

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or

(2) if such contract or lease has been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title-

(A) if before such rejection the case has not been converted under section 1112, 1208, or 1307 of this title, at the time of such rejection; or

(B) if before such rejection the case has been converted under section 1112, 1208, or 1307 of this title-

(i) immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or

(ii) at the time of such rejection, if such contract or lease was assumed after such conversion.

(h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and-

(i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

(ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

(B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

(C) The rejection of a lease of real property in a shopping center with respect to which the lessee elects to retain its rights under subparagraph (A)(ii) does not affect the enforceability under applicable nonbankruptcy law of any provision in the lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

(D) In this paragraph, "lessee" includes any successor, assign, or mortgagee permitted under the terms of such lease.

(2)(A) If the trustee rejects a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller and-

(i) if the rejection amounts to such a breach as would entitle the timeshare interest purchaser to treat the timeshare plan as terminated under its terms, applicable nonbankruptcy law, or any agreement made by timeshare interest purchaser, the timeshare interest purchaser under the timeshare plan may treat the timeshare plan as terminated by such rejection; or

(ii) if the term of such timeshare interest has commenced, then the timeshare interest purchaser may retain its rights in such timeshare interest for the balance of such term and for any term of renewal or extension of such timeshare interest to the extent that such rights are enforceable under applicable nonbankruptcy law.

(B) If the timeshare interest purchaser retains its rights under subparagraph (A), such timeshare interest purchaser may offset against the moneys due for such timeshare interest for the balance of the term after the date of the rejection of such timeshare interest, and the term of any renewal or extension of such timeshare interest, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such timeshare plan, but the timeshare interest purchaser shall not have any right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

(2) If such purchaser remains in possession-

(A) such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and

(B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

Add. 29

(j) A purchaser that treats an executory contract as terminated under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.

(k) Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

(l) If an unexpired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.

(m) For purposes of this section 365 and sections 541(b)(2) and 362(b)(10), leases of real property shall include any rental agreement to use real property.

(n)(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect-

(A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

(B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for-

(i) the duration of such contract; and

(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

(2) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract-

(A) the trustee shall allow the licensee to exercise such rights;

(B) the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract; and

(C) the licensee shall be deemed to waive-

(i) any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and

(ii) any claim allowable under section 503(b) of this title arising from the performance of such contract.

(3) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, then on the written request of the licensee the trustee shall-

(A) to the extent provided in such contract, or any agreement supplementary to such contract, provide to the licensee any intellectual property (including such embodiment) held by the trustee; and

(B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

(4) Unless and until the trustee rejects such contract, on the written request of the licensee the trustee shall-

(A) to the extent provided in such contract or any agreement supplementary to such contract-

(i) perform such contract; or

(ii) provide to the licensee such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law) held by the trustee; and

(B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment), including any right to obtain such intellectual property (or such embodiment) from another entity.

(o) In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

(p)(1) If a lease of personal property is rejected or not timely assumed by the trustee under subsection (d), the leased property is no longer property of the estate and the stay under section 362(a) is automatically terminated.

(2)(A) If the debtor in a case under chapter 7 is an individual, the debtor may notify the creditor in writing that the debtor desires to assume the lease. Upon being so notified, the creditor may, at its option, notify the debtor that it is willing to have the lease assumed by the debtor and may condition such assumption on cure of any outstanding default on terms set by the

Add. 30

contract.

(B) If, not later than 30 days after notice is provided under subparagraph (A), the debtor notifies the lessor in writing that the lease is assumed, the liability under the lease will be assumed by the debtor and not by the estate.

(C) The stay under section 362 and the injunction under section 524(a)(2) shall not be violated by notification of the debtor and negotiation of cure under this subsection.

(3) In a case under chapter 11 in which the debtor is an individual and in a case under chapter 13, if the debtor is the lessee with respect to personal property and the lease is not assumed in the plan confirmed by the court, the lease is deemed rejected as of the conclusion of the hearing on confirmation. If the lease is rejected, the stay under section 362 and any stay under section 1301 is automatically terminated with respect to the property subject to the lease.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2574 ; Pub. L. 98–353, title III, §§362, 402–404, July 10, 1984, 98 Stat. 361 , 367; Pub. L. 99–554, title II, §§257(j), (m), 283(e), Oct. 27, 1986, 100 Stat. 3115 , 3117; Pub. L. 100–506, §1(b), Oct. 18, 1988, 102 Stat. 2538 ; Pub. L. 101–647, title XXV, §2522(c), Nov. 29, 1990, 104 Stat. 4866 ; Pub. L. 102–365, §19(b)–(e), Sept. 3, 1992, 106 Stat. 982–984 ; Pub. L. 103–394, title II, §§205(a), 219(a), (b), title V, §501(d)(10), Oct. 22, 1994, 108 Stat. 4122 , 4128, 4145; Pub. L. 103–429, §1, Oct. 31, 1994, 108 Stat. 4377 ; Pub. L. 109–8, title III, §§309(b), 328(a), title IV, §404, Apr. 20, 2005, 119 Stat. 82 , 100, 104.)

Add. 31

---

**11 USC 524: Effect of discharge**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 5-CREDITORS, THE DEBTOR, AND THE ESTATE
    SUBCHAPTER II-DEBTOR'S DUTIES AND BENEFITS
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **References In Text**
    **Amendments**
    **Effective Date**
    **Construction**

---

# §524. Effect of discharge

(a) A discharge in a case under this title-

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a)(1), or 1328(a)(1), or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

(b) Subsection (a)(3) of this section does not apply if-

(1)(A) the debtor's spouse is a debtor in a case under this title, or a bankrupt or a debtor in a case under the Bankruptcy Act, commenced within six years of the date of the filing of the petition in the case concerning the debtor; and

(B) the court does not grant the debtor's spouse a discharge in such case concerning the debtor's spouse; or

(2)(A) the court would not grant the debtor's spouse a discharge in a case under chapter 7 of this title concerning such spouse commenced on the date of the filing of the petition in the case concerning the debtor; and

(B) a determination that the court would not so grant such discharge is made by the bankruptcy court within the time and in the manner provided for a determination under section 727 of this title of whether a debtor is granted a discharge.

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if-

(1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;

(2) the debtor received the disclosures described in subsection (k) at or before the time at which the debtor signed the agreement;

(3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that-

    (A) such agreement represents a fully informed and voluntary agreement by the debtor;

    (B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

    (C) the attorney fully advised the debtor of the legal effect and consequences of-

        (i) an agreement of the kind specified in this subsection; and

        (ii) any default under such an agreement;

(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;

(5) the provisions of subsection (d) of this section have been complied with; and

(6)(A) in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as-

(i) not imposing an undue hardship on the debtor or a dependent of the debtor; and

(ii) in the best interest of the debtor.

(B) Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.

(d) In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141, 1228, or 1328 of this title, the court may hold a hearing at which the debtor shall appear in person. At any such hearing, the court shall inform the debtor that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section and was not represented by an attorney during the course of negotiating such agreement, then the court shall hold a hearing at which the debtor shall appear in person and at such hearing the court shall-

(1) inform the debtor-

(A) that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and

(B) of the legal effect and consequences of-

(i) an agreement of the kind specified in subsection (c) of this section; and

(ii) a default under such an agreement; and

(2) determine whether the agreement that the debtor desires to make complies with the requirements of subsection (c)(6) of this section, if the consideration for such agreement is based in whole or in part on a consumer debt that is not secured by real property of the debtor.

(e) Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

(f) Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt.

(g)(1)(A) After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.

(B) An injunction may be issued under subparagraph (A) to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.

(2)(A) Subject to subsection (h), if the requirements of subparagraph (B) are met at the time an injunction described in paragraph (1) is entered, then after entry of such injunction, any proceeding that involves the validity, application, construction, or modification of such injunction, or of this subsection with respect to such injunction, may be commenced only in the district court in which such injunction was entered, and such court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy.

(B) The requirements of this subparagraph are that-

(i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization-

(I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

(III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of-

(aa) each such debtor;

(bb) the parent corporation of each such debtor; or

(cc) a subsidiary of each such debtor that is also a debtor; and

(IV) is to use its assets or income to pay claims and demands; and

(ii) subject to subsection (h), the court determines that-

(I) the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

(II) the actual amounts, numbers, and timing of such future demands cannot be determined;

(III) pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands;

(IV) as part of the process of seeking confirmation of such plan-

(aa) the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and

Add. 33

(bb) a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

(V) subject to subsection (h), pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

(3)(A) If the requirements of paragraph (2)(B) are met and the order confirming the plan of reorganization was issued or affirmed by the district court that has jurisdiction over the reorganization case, then after the time for appeal of the order that issues or affirms the plan-

(i) the injunction shall be valid and enforceable and may not be revoked or modified by any court except through appeal in accordance with paragraph (6);

(ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

(iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason;

(B) Subparagraph (A) shall not be construed to-

(i) imply that an entity described in subparagraph (A)(ii) or (iii) would, if this paragraph were not applicable, necessarily be liable to any entity by reason of any of the acts described in subparagraph (A);

(ii) relieve any such entity of the duty to comply with, or of liability under, any Federal or State law regarding the making of a fraudulent conveyance in a transaction described in subparagraph (A)(ii) or (iii); or

(iii) relieve a debtor of the debtor's obligation to comply with the terms of the plan of reorganization, or affect the power of the court to exercise its authority under sections 1141 and 1142 to compel the debtor to do so.

(4)(A)(i) Subject to subparagraph (B), an injunction described in paragraph (1) shall be valid and enforceable against all entities that it addresses.

(ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of-

(I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to-

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

(iii) As used in this subparagraph, the term "related party" means-

(I) a past or present affiliate of the debtor;

(II) a predecessor in interest of the debtor; or

(III) any entity that owned a financial interest in-

(aa) the debtor;

(bb) a past or present affiliate of the debtor; or

(cc) a predecessor in interest of the debtor.

(B) Subject to subsection (h), if, under a plan of reorganization, a kind of demand described in such plan is to be paid in whole or in part by a trust described in paragraph (2)(B)(i) in connection with which an injunction described in paragraph (1) is to be implemented, then such injunction shall be valid and enforceable with respect to a demand of such kind made, after such plan is confirmed, against the debtor or debtors involved, or against a third party described in subparagraph (A)(ii), if-

(i) as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind, and

(ii) the court determines, before entering the order confirming such plan, that identifying such debtor or debtors, or such third party (by name or as part of an identifiable group), in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of

Add. 34

the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

(5) In this subsection, the term "demand" means a demand for payment, present or future, that-
    (A) was not a claim during the proceedings leading to the confirmation of a plan of reorganization;
    (B) arises out of the same or similar conduct or events that gave rise to the claims addressed by the injunction issued under paragraph (1); and
    (C) pursuant to the plan, is to be paid by a trust described in paragraph (2)(B)(i).

(6) Paragraph (3)(A)(i) does not bar an action taken by or at the direction of an appellate court on appeal of an injunction issued under paragraph (1) or of the order of confirmation that relates to the injunction.
(7) This subsection does not affect the operation of section 1144 or the power of the district court to refer a proceeding under section 157 of title 28 or any reference of a proceeding made prior to the date of the enactment of this subsection.
(h) Application to Existing Injunctions.-For purposes of subsection (g)-
    (1) subject to paragraph (2), if an injunction of the kind described in subsection (g)(1)(B) was issued before the date of the enactment of this Act, as part of a plan of reorganization confirmed by an order entered before such date, then the injunction shall be considered to meet the requirements of subsection (g)(2)(B) for purposes of subsection (g)(2)(A), and to satisfy subsection (g)(4)(A)(ii), if-
        (A) the court determined at the time the plan was confirmed that the plan was fair and equitable in accordance with the requirements of section 1129(b);
        (B) as part of the proceedings leading to issuance of such injunction and confirmation of such plan, the court had appointed a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands described in subsection (g)(4)(B) with respect to such plan; and
        (C) such legal representative did not object to confirmation of such plan or issuance of such injunction; and

(2) for purposes of paragraph (1), if a trust described in subsection (g)(2)(B)(i) is subject to a court order on the date of the enactment of this Act staying such trust from settling or paying further claims-
    (A) the requirements of subsection (g)(2)(B)(ii)(V) shall not apply with respect to such trust until such stay is lifted or dissolved; and
    (B) if such trust meets such requirements on the date such stay is lifted or dissolved, such trust shall be considered to have met such requirements continuously from the date of the enactment of this Act.

(i) The willful failure of a creditor to credit payments received under a plan confirmed under this title, unless the order confirming the plan is revoked, the plan is in default, or the creditor has not received payments required to be made under the plan in the manner required by the plan (including crediting the amounts required under the plan), shall constitute a violation of an injunction under subsection (a)(2) if the act of the creditor to collect and failure to credit payments in the manner required by the plan caused material injury to the debtor.
(j) Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if-
    (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
    (2) such act is in the ordinary course of business between the creditor and the debtor; and
    (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

(k)(1) The disclosures required under subsection (c)(2) shall consist of the disclosure statement described in paragraph (3), completed as required in that paragraph, together with the agreement specified in subsection (c), statement, declaration, motion and order described, respectively, in paragraphs (4) through (8), and shall be the only disclosures required in connection with entering into such agreement.
(2) Disclosures made under paragraph (1) shall be made clearly and conspicuously and in writing. The terms "Amount Reaffirmed" and "Annual Percentage Rate" shall be disclosed more conspicuously than other terms, data or information provided in connection with this disclosure, except that the phrases "Before agreeing to reaffirm a debt, review these important disclosures" and "Summary of Reaffirmation Agreement" may be equally conspicuous. Disclosures may be made in a different order and may use terminology different from that set forth in paragraphs (2) through (8), except that the terms "Amount Reaffirmed" and "Annual Percentage Rate" must be used where indicated.
(3) The disclosure statement required under this paragraph shall consist of the following:
    (A) The statement: "Part A: Before agreeing to reaffirm a debt, review these important disclosures:";
    (B) Under the heading "Summary of Reaffirmation Agreement", the statement: "This Summary is made pursuant to the requirements of the Bankruptcy Code";
    (C) The "Amount Reaffirmed", using that term, which shall be-
        (i) the total amount of debt that the debtor agrees to reaffirm by entering into an agreement of the kind specified in subsection (c), and
        (ii) the total of any fees and costs accrued as of the date of the disclosure statement, related to such total amount.

    (D) In conjunction with the disclosure of the "Amount Reaffirmed", the statements-

(i) "The amount of debt you have agreed to reaffirm"; and
(ii) "Your credit agreement may obligate you to pay additional amounts which may come due after the date of this disclosure. Consult your credit agreement.".

(E) The "Annual Percentage Rate", using that term, which shall be disclosed as-
    (i) if, at the time the petition is filed, the debt is an extension of credit under an open end credit plan, as the terms "credit" and "open end credit plan" are defined in section 103 of the Truth in Lending Act, then-
        (I) the annual percentage rate determined under paragraphs (5) and (6) of section 127(b) of the Truth in Lending Act, as applicable, as disclosed to the debtor in the most recent periodic statement prior to entering into an agreement of the kind specified in subsection (c) or, if no such periodic statement has been given to the debtor during the prior 6 months, the annual percentage rate as it would have been so disclosed at the time the disclosure statement is given to the debtor, or to the extent this annual percentage rate is not readily available or not applicable, then
        (II) the simple interest rate applicable to the amount reaffirmed as of the date the disclosure statement is given to the debtor, or if different simple interest rates apply to different balances, the simple interest rate applicable to each such balance, identifying the amount of each such balance included in the amount reaffirmed, or
        (III) if the entity making the disclosure elects, to disclose the annual percentage rate under subclause (I) and the simple interest rate under subclause (II); or

    (ii) if, at the time the petition is filed, the debt is an extension of credit other than under an open end credit plan, as the terms "credit" and "open end credit plan" are defined in section 103 of the Truth in Lending Act, then-
        (I) the annual percentage rate under section 128(a)(4) of the Truth in Lending Act, as disclosed to the debtor in the most recent disclosure statement given to the debtor prior to the entering into an agreement of the kind specified in subsection (c) with respect to the debt, or, if no such disclosure statement was given to the debtor, the annual percentage rate as it would have been so disclosed at the time the disclosure statement is given to the debtor, or to the extent this annual percentage rate is not readily available or not applicable, then
        (II) the simple interest rate applicable to the amount reaffirmed as of the date the disclosure statement is given to the debtor, or if different simple interest rates apply to different balances, the simple interest rate applicable to each such balance, identifying the amount of such balance included in the amount reaffirmed, or
        (III) if the entity making the disclosure elects, to disclose the annual percentage rate under (I) and the simple interest rate under (II).

    (F) If the underlying debt transaction was disclosed as a variable rate transaction on the most recent disclosure given under the Truth in Lending Act, by stating "The interest rate on your loan may be a variable interest rate which changes from time to time, so that the annual percentage rate disclosed here may be higher or lower.".
    (G) If the debt is secured by a security interest which has not been waived in whole or in part or determined to be void by a final order of the court at the time of the disclosure, by disclosing that a security interest or lien in goods or property is asserted over some or all of the debts the debtor is reaffirming and listing the items and their original purchase price that are subject to the asserted security interest, or if not a purchase-money security interest then listing by items or types and the original amount of the loan.
    (H) At the election of the creditor, a statement of the repayment schedule using 1 or a combination of the following-
        (i) by making the statement: "Your first payment in the amount of $_____ is due on _____ but the future payment amount may be different. Consult your reaffirmation agreement or credit agreement, as applicable.", and stating the amount of the first payment and the due date of that payment in the places provided;
        (ii) by making the statement: "Your payment schedule will be:", and describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party; or
        (iii) by describing the debtor's repayment obligations with reasonable specificity to the extent then known by the disclosing party.

    (I) The following statement: "Note: When this disclosure refers to what a creditor 'may' do, it does not use the word 'may' to give the creditor specific permission. The word 'may' is used to tell you what might occur if the law permits the creditor to take the action. If you have questions about your reaffirming a debt or what the law requires, consult with the attorney who helped you negotiate this agreement reaffirming a debt. If you don't have an attorney helping you, the judge will explain the effect of your reaffirming a debt when the hearing on the reaffirmation agreement is held.".
    (J)(i) The following additional statements:

"Reaffirming a debt is a serious financial decision. The law requires you to take certain steps to make sure the decision is in your best interest. If these steps are not completed, the reaffirmation agreement is not effective, even though you have signed it.
    "1. Read the disclosures in this Part A carefully. Consider the decision to reaffirm carefully. Then, if you want to reaffirm, sign the reaffirmation agreement in Part B (or you may use a separate agreement you and your creditor agree on).
    "2. Complete and sign Part D and be sure you can afford to make the payments you are agreeing to make and have

Add. 36

received a copy of the disclosure statement and a completed and signed reaffirmation agreement.

"3. If you were represented by an attorney during the negotiation of your reaffirmation agreement, the attorney must have signed the certification in Part C.

"4. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, you must have completed and signed Part E.

"5. The original of this disclosure must be filed with the court by you or your creditor. If a separate reaffirmation agreement (other than the one in Part B) has been signed, it must be attached.

"6. If you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court unless the reaffirmation is presumed to be an undue hardship as explained in Part D.

"7. If you were not represented by an attorney during the negotiation of your reaffirmation agreement, it will not be effective unless the court approves it. The court will notify you of the hearing on your reaffirmation agreement. You must attend this hearing in bankruptcy court where the judge will review your reaffirmation agreement. The bankruptcy court must approve your reaffirmation agreement as consistent with your best interests, except that no court approval is required if your reaffirmation agreement is for a consumer debt secured by a mortgage, deed of trust, security deed, or other lien on your real property, like your home.

"Your right to rescind (cancel) your reaffirmation agreement. You may rescind (cancel) your reaffirmation agreement at any time before the bankruptcy court enters a discharge order, or before the expiration of the 60-day period that begins on the date your reaffirmation agreement is filed with the court, whichever occurs later. To rescind (cancel) your reaffirmation agreement, you must notify the creditor that your reaffirmation agreement is rescinded (or canceled).

"What are your obligations if you reaffirm the debt? A reaffirmed debt remains your personal legal obligation. It is not discharged in your bankruptcy case. That means that if you default on your reaffirmed debt after your bankruptcy case is over, your creditor may be able to take your property or your wages. Otherwise, your obligations will be determined by the reaffirmation agreement which may have changed the terms of the original agreement. For example, if you are reaffirming an open end credit agreement, the creditor may be permitted by that agreement or applicable law to change the terms of that agreement in the future under certain conditions.

"Are you required to enter into a reaffirmation agreement by any law? No, you are not required to reaffirm a debt by any law. Only agree to reaffirm a debt if it is in your best interest. Be sure you can afford the payments you agree to make.

"What if your creditor has a security interest or lien? Your bankruptcy discharge does not eliminate any lien on your property. A 'lien' is often referred to as a security interest, deed of trust, mortgage or security deed. Even if you do not reaffirm and your personal liability on the debt is discharged, because of the lien your creditor may still have the right to take the property securing the lien if you do not pay the debt or default on it. If the lien is on an item of personal property that is exempt under your State's law or that the trustee has abandoned, you may be able to redeem the item rather than reaffirm the debt. To redeem, you must make a single payment to the creditor equal to the amount of the allowed secured claim, as agreed by the parties or determined by the court.".

(ii) In the case of a reaffirmation under subsection (m)(2), numbered paragraph 6 in the disclosures required by clause (i) of this subparagraph shall read as follows:

"6. If you were represented by an attorney during the negotiation of your reaffirmation agreement, your reaffirmation agreement becomes effective upon filing with the court.".

(4) The form of such agreement required under this paragraph shall consist of the following:

"Part B: Reaffirmation Agreement. I (we) agree to reaffirm the debts arising under the credit agreement described below.

"Brief description of credit agreement:

"Description of any changes to the credit agreement made as part of this reaffirmation agreement:

"Signature:            Date:

"Borrower:

"Co-borrower, if also reaffirming these debts:

"Accepted by creditor:

"Date of creditor acceptance:".

(5) The declaration shall consist of the following:

(A) The following certification:

"Part C: Certification by Debtor's Attorney (If Any).

"I hereby certify that (1) this agreement represents a fully informed and voluntary agreement by the debtor; (2) this agreement does not impose an undue hardship on the debtor or any dependent of the debtor; and (3) I have fully advised the debtor of the legal effect and consequences of this agreement and any default under this agreement.

"Signature of Debtor's Attorney:       Date:".

(B) If a presumption of undue hardship has been established with respect to such agreement, such certification shall state that, in the opinion of the attorney, the debtor is able to make the payment.

(C) In the case of a reaffirmation agreement under subsection (m)(2), subparagraph (B) is not applicable.

Add. 37

(6)(A) The statement in support of such agreement, which the debtor shall sign and date prior to filing with the court, shall consist of the following:

"Part D: Debtor's Statement in Support of Reaffirmation Agreement.

"1. I believe this reaffirmation agreement will not impose an undue hardship on my dependents or me. I can afford to make the payments on the reaffirmed debt because my monthly income (take home pay plus any other income received) is $_____, and my actual current monthly expenses including monthly payments on post-bankruptcy debt and other reaffirmation agreements total $_____, leaving $_____ to make the required payments on this reaffirmed debt. I understand that if my income less my monthly expenses does not leave enough to make the payments, this reaffirmation agreement is presumed to be an undue hardship on me and must be reviewed by the court. However, this presumption may be overcome if I explain to the satisfaction of the court how I can afford to make the payments here: _____.

"2. I received a copy of the Reaffirmation Disclosure Statement in Part A and a completed and signed reaffirmation agreement.".

(B) Where the debtor is represented by an attorney and is reaffirming a debt owed to a creditor defined in section 19(b)(1)(A)(iv) of the Federal Reserve Act, the statement of support of the reaffirmation agreement, which the debtor shall sign and date prior to filing with the court, shall consist of the following:

"I believe this reaffirmation agreement is in my financial interest. I can afford to make the payments on the reaffirmed debt. I received a copy of the Reaffirmation Disclosure Statement in Part A and a completed and signed reaffirmation agreement.".

(7) The motion that may be used if approval of such agreement by the court is required in order for it to be effective, shall be signed and dated by the movant and shall consist of the following:

"Part E: Motion for Court Approval (To be completed only if the debtor is not represented by an attorney.). I (we), the debtor(s), affirm the following to be true and correct:

"I am not represented by an attorney in connection with this reaffirmation agreement.

"I believe this reaffirmation agreement is in my best interest based on the income and expenses I have disclosed in my Statement in Support of this reaffirmation agreement, and because (provide any additional relevant reasons the court should consider):

"Therefore, I ask the court for an order approving this reaffirmation agreement.".

(8) The court order, which may be used to approve such agreement, shall consist of the following:

"Court Order: The court grants the debtor's motion and approves the reaffirmation agreement described above.".

(l) Notwithstanding any other provision of this title the following shall apply:

(1) A creditor may accept payments from a debtor before and after the filing of an agreement of the kind specified in subsection (c) with the court.

(2) A creditor may accept payments from a debtor under such agreement that the creditor believes in good faith to be effective.

(3) The requirements of subsections (c)(2) and (k) shall be satisfied if disclosures required under those subsections are given in good faith.

(m)(1) Until 60 days after an agreement of the kind specified in subsection (c) is filed with the court (or such additional period as the court, after notice and a hearing and for cause, orders before the expiration of such period), it shall be presumed that such agreement is an undue hardship on the debtor if the debtor's monthly income less the debtor's monthly expenses as shown on the debtor's completed and signed statement in support of such agreement required under subsection (k)(6)(A) is less than the scheduled payments on the reaffirmed debt. This presumption shall be reviewed by the court. The presumption may be rebutted in writing by the debtor if the statement includes an explanation that identifies additional sources of funds to make the payments as agreed upon under the terms of such agreement. If the presumption is not rebutted to the satisfaction of the court, the court may disapprove such agreement. No agreement shall be disapproved without notice and a hearing to the debtor and creditor, and such hearing shall be concluded before the entry of the debtor's discharge.

(2) This subsection does not apply to reaffirmation agreements where the creditor is a credit union, as defined in section 19 (b)(1)(A)(iv) of the Federal Reserve Act.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2592 ; Pub. L. 98–353, title III, §§308, 455, July 10, 1984, 98 Stat. 354 , 376; Pub. L. 99–554, title II, §§257(o), 282, 283(k), Oct. 27, 1986, 100 Stat. 3115–3117 ; Pub. L. 103–394, title I, §§103, 111(a), title V, §501(d)(14), Oct. 22, 1994, 108 Stat. 4108 , 4113, 4145; Pub. L. 109–8, title II, §§202, 203(a), title XII, §1210, Apr. 20, 2005, 119 Stat. 43 , 194; Pub. L. 111–327, §2(a)(19), Dec. 22, 2010, 124 Stat. 3559 .)

---

**11 USC 727: Discharge**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
     CHAPTER 7-LIQUIDATION
     SUBCHAPTER II-COLLECTION, LIQUIDATION, AND DISTRIBUTION OF THE ESTATE
**Jump To:**
     <u>**Source Credit**</u>
     <u>**Miscellaneous**</u>
     <u>**References In Text**</u>
     <u>**Amendments**</u>
     <u>**Effective Date**</u>

---

# §727. Discharge

(a) The court shall grant the debtor a discharge, unless-
    (1) the debtor is not an individual;
    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-
        (A) property of the debtor, within one year before the date of the filing of the petition; or
        (B) property of the estate, after the date of the filing of the petition;

    (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
    (4) the debtor knowingly and fraudulently, in or in connection with the case-
        (A) made a false oath or account;
        (B) presented or used a false claim;
        (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
        (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

    (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;
    (6) the debtor has refused, in the case-
        (A) to obey any lawful order of the court, other than an order to respond to a material question or to testify;
        (B) on the ground of privilege against self-incrimination, to respond to a material question approved by the court or to testify, after the debtor has been granted immunity with respect to the matter concerning which such privilege was invoked; or
        (C) on a ground other than the properly invoked privilege against self-incrimination, to respond to a material question approved by the court or to testify;

    (7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider;
    (8) the debtor has been granted a discharge under this section, under section 1141 of this title, or under section 14, 371, or 476 of the Bankruptcy Act, in a case commenced within 8 years before the date of the filing of the petition;
    (9) the debtor has been granted a discharge under section 1228 or 1328 of this title, or under section 660 or 661 of the Bankruptcy Act, in a case commenced within six years before the date of the filing of the petition, unless payments under the plan in such case totaled at least-
        (A) 100 percent of the allowed unsecured claims in such case; or
        (B)(i) 70 percent of such claims; and
        (ii) the plan was proposed by the debtor in good faith, and was the debtor's best effort;

    (10) the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter;
    (11) after filing the petition, the debtor failed to complete an instructional course concerning personal financial management described in section 111, except that this paragraph shall not apply with respect to a debtor who is a person described in section 109(h)(4) or who resides in a district for which the United States trustee (or the bankruptcy

Add. 39

administrator, if any) determines that the approved instructional courses are not adequate to service the additional individuals who would otherwise be required to complete such instructional courses under this section (The United States trustee (or the bankruptcy administrator, if any) who makes a determination described in this paragraph shall review such determination not later than 1 year after the date of such determination, and not less frequently than annually thereafter.); or

(12) the court after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge finds that there is reasonable cause to believe that-

(A) section 522(q)(1) may be applicable to the debtor; and

(B) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B).

(b) Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.

(c)(1) The trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of this section.

(2) On request of a party in interest, the court may order the trustee to examine the acts and conduct of the debtor to determine whether a ground exists for denial of discharge.

(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if-

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;

(2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee;

(3) the debtor committed an act specified in subsection (a)(6) of this section; or

(4) the debtor has failed to explain satisfactorily-

(A) a material misstatement in an audit referred to in section 586(f) of title 28; or

(B) a failure to make available for inspection all necessary accounts, papers, documents, financial records, files, and all other papers, things, or property belonging to the debtor that are requested for an audit referred to in section 586(f) of title 28.

(e) The trustee, a creditor, or the United States trustee may request a revocation of a discharge-

(1) under subsection (d)(1) of this section within one year after such discharge is granted; or

(2) under subsection (d)(2) or (d)(3) of this section before the later of-

(A) one year after the granting of such discharge; and

(B) the date the case is closed.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2609 ; Pub. L. 98–353, title III, §480, July 10, 1984, 98 Stat. 382 ; Pub. L. 99–554, title II, §§220, 257(s), Oct. 27, 1986, 100 Stat. 3101 , 3116; Pub. L. 109–8, title I, §106(b), title III, §§312(1), 330(a), title VI, §603(d), Apr. 20, 2005, 119 Stat. 38 , 86, 101, 123.)

Add. 40

---

**11 USC 944: Effect of confirmation**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
  CHAPTER 9-ADJUSTMENT OF DEBTS OF A MUNICIPALITY
  SUBCHAPTER III-THE PLAN
**Jump To:**
  **Source Credit**

---

## §944. Effect of confirmation

(a) The provisions of a confirmed plan bind the debtor and any creditor, whether or not-
 (1) a proof of such creditor's claim is filed or deemed filed under section 501 of this title;
 (2) such claim is allowed under section 502 of this title; or
 (3) such creditor has accepted the plan.

(b) Except as provided in subsection (c) of this section, the debtor is discharged from all debts as of the time when-
 (1) the plan is confirmed;
 (2) the debtor deposits any consideration to be distributed under the plan with a disbursing agent appointed by the court; and
 (3) the court has determined-
  (A) that any security so deposited will constitute, after distribution, a valid legal obligation of the debtor; and
  (B) that any provision made to pay or secure payment of such obligation is valid.

(c) The debtor is not discharged under subsection (b) of this section from any debt-
 (1) excepted from discharge by the plan or order confirming the plan; or
 (2) owed to an entity that, before confirmation of the plan, had neither notice nor actual knowledge of the case.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2624 .)

---

Add. 41

**11 USC 1123: Contents of plan**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 11-REORGANIZATION
    SUBCHAPTER II-THE PLAN
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **Amendments**
    **Effective Date**

## §1123. Contents of plan

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall-

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507 (a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests;

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as-

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee; and

(8) in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

(b) Subject to subsection (a) of this section, a plan may-

(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

(3) provide for-

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

Add. 42

    (5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

    (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

    (c) In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease.

    (d) Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2631 ; Pub. L. 98–353, title III, §507, July 10, 1984, 98 Stat. 385 ; Pub. L. 103–394, title II, §206, title III, §§304(h)(6), 305(a), title V, §501(d)(31), Oct. 22, 1994, 108 Stat. 4123 , 4134, 4146; Pub. L. 109–8, title III, §321(b), title XV, §1502(a)(7), Apr. 20, 2005, 119 Stat. 95 , 216.)

**11 USC 1141: Effect of confirmation**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
  CHAPTER 11-REORGANIZATION
  SUBCHAPTER III-POSTCONFIRMATION MATTERS
**Jump To:**
  **Source Credit**
  **Miscellaneous**
  **Amendments**
  **Effective Date**

# §1141. Effect of confirmation

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan-

 (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not-

  (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;
  (ii) such claim is allowed under section 502 of this title; or
  (iii) the holder of such claim has accepted the plan; and

 (B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

(2) A discharge under this chapter does not discharge a debtor who is an individual from any debt excepted from discharge under section 523 of this title.

(3) The confirmation of a plan does not discharge a debtor if-

 (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
 (B) the debtor does not engage in business after consummation of the plan; and
 (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

(4) The court may approve a written waiver of discharge executed by the debtor after the order for relief under this chapter.

(5) In a case in which the debtor is an individual-

 (A) unless after notice and a hearing the court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the plan until the court grants a discharge on completion of all payments under the plan;

 (B) at any time after the confirmation of the plan, and after notice and a hearing, the court may grant a discharge to the debtor who has not completed payments under the plan if-

  (i) the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 on such date;
  (ii) modification of the plan under section 1127 is not practicable; and
  (iii) subparagraph (C) permits the court to grant a discharge; and

 (C) the court may grant a discharge if, after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge, the court finds that there is no reasonable cause to believe that-

  (i) section 522(q)(1) may be applicable to the debtor; and
  (ii) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B);

Add. 44

and if the requirements of subparagraph (A) or (B) are met.

(6) Notwithstanding paragraph (1), the confirmation of a plan does not discharge a debtor that is a corporation from any debt—

(A) of a kind specified in paragraph (2)(A) or (2)(B) of section 523(a) that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute; or

(B) for a tax or customs duty with respect to which the debtor-

(i) made a fraudulent return; or

(ii) willfully attempted in any manner to evade or to defeat such tax or such customs duty.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2638 ; Pub. L. 98–353, title III, §513, July 10, 1984, 98 Stat. 387 ; Pub. L. 109–8, title III, §§321(d), 330(b), title VII, §708, Apr. 20, 2005, 119 Stat. 95 , 101, 126; Pub. L. 111–327, §2(a)(36), Dec. 22, 2010, 124 Stat. 3561 .)

**11 USC 1142: Implementation of plan**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
  CHAPTER 11-REORGANIZATION
  SUBCHAPTER III-POSTCONFIRMATION MATTERS
**Jump To:**
  **Source Credit**
  **Amendments**
  **Effective Date**

## §1142. Implementation of plan

 (a) Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

 (b) The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2639 ; Pub. L. 98–353, title III, §514(a), (c), (d), July 10, 1984, 98 Stat. 387 .)

**11 USC 1228: Discharge**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 12-ADJUSTMENT OF DEBTS OF A FAMILY FARMER OR FISHERMAN WITH REGULAR ANNUAL INCOME
    SUBCHAPTER II-THE PLAN
**Jump To:**
    **Source Credit**
    **Codification**
    **Amendments**
    **Effective Date**

# §1228. Discharge

(a) Subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan, and in the case of a debtor who is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, after such debtor certifies that all amounts payable under such order or such statute that are due on or before the date of the certification (including amounts due before the petition was filed, but only to the extent provided for by the plan) have been paid, other than payments to holders of allowed claims provided for under section 1222(b)(5) or 1222(b)(9) of this title, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan allowed under section 503 of this title or disallowed under section 502 of this title, except any debt-
    (1) provided for under section 1222(b)(5) or 1222(b)(9) of this title; or
    (2) of the kind specified in section 523(a) of this title.

(b) Subject to subsection (d), at any time after the confirmation of the plan and after notice and a hearing, the court may grant a discharge to a debtor that has not completed payments under the plan only if-
    (1) the debtor's failure to complete such payments is due to circumstances for which the debtor should not justly be held accountable;
    (2) the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 of this title on such date; and
    (3) modification of the plan under section 1229 of this title is not practicable.

(c) A discharge granted under subsection (b) of this section discharges the debtor from all unsecured debts provided for by the plan or disallowed under section 502 of this title, except any debt-
    (1) provided for under section 1222(b)(5) or 1222(b)(9) of this title; or
    (2) of a kind specified in section 523(a) of this title.

(d) On request of a party in interest before one year after a discharge under this section is granted, and after notice and a hearing, the court may revoke such discharge only if-
    (1) such discharge was obtained by the debtor through fraud; and
    (2) the requesting party did not know of such fraud until after such discharge was granted.

(e) After the debtor is granted a discharge, the court shall terminate the services of any trustee serving in the case.
(f) The court may not grant a discharge under this chapter unless the court after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge finds that there is no reasonable cause to believe that-
    (1) section 522(q)(1) may be applicable to the debtor; and
    (2) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B).

(Added and amended Pub. L. 99–554, title II, §255, title III, §302(f), Oct. 27, 1986, 100 Stat. 3112 , 3124; Pub. L. 103–65, §1, Aug. 6, 1993, 107 Stat. 311 ; Pub. L. 105–277, div. C, title I, §149(a), Oct. 21, 1998, 112 Stat. 2681–610 ; Pub. L. 106–5, §1 (1), (2), Mar. 30, 1999, 113 Stat. 9 ; Pub. L. 106–70, §1, Oct. 9, 1999, 113 Stat. 1031 ; Pub. L. 106–518, title II, §208, Nov. 13, 2000, 114 Stat. 2415 ; Pub. L. 107–8, §1, May 11, 2001, 115 Stat. 10 ; Pub. L. 107–17, §1, June 26, 2001, 115 Stat. 151 ; Pub. L. 107–170, §1, May 7, 2002, 116 Stat. 133 ; Pub. L. 107–171, title X, §10814(a), May 13, 2002, 116 Stat. 532 ; Pub. L. 107–377, §2(a), Dec. 19, 2002, 116 Stat. 3115 ; Pub. L. 108–73, §2(a), Aug. 15, 2003, 117 Stat. 891 ; Pub. L. 108–369, §2(a), Oct. 25, 2004, 118 Stat. 1749 ; Pub. L. 109–8, title II, §213(6), title III, §330(c), title X, §1001(a)(1), (c), Apr. 20,

2005, 119 Stat. 53 , 101, 185, 186.)

---

**11 USC 1328: Discharge**
Text contains those laws in effect on July 17, 2014

**From Title 11-BANKRUPTCY**
    CHAPTER 13-ADJUSTMENT OF DEBTS OF AN INDIVIDUAL WITH REGULAR INCOME
    SUBCHAPTER II-THE PLAN
**Jump To:**
    <u>Source Credit</u>
    <u>Miscellaneous</u>
    <u>Amendments</u>
    <u>Effective Date</u>

---

# §1328. Discharge

(a) Subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan, and in the case of a debtor who is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, after such debtor certifies that all amounts payable under such order or such statute that are due on or before the date of the certification (including amounts due before the petition was filed, but only to the extent provided for by the plan) have been paid, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt-

    (1) provided for under section 1322(b)(5);

    (2) of the kind specified in section 507(a)(8)(C) or in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523 (a);

    (3) for restitution, or a criminal fine, included in a sentence on the debtor's conviction of a crime; or

    (4) for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused personal injury to an individual or the death of an individual.

(b) Subject to subsection (d), at any time after the confirmation of the plan and after notice and a hearing, the court may grant a discharge to a debtor that has not completed payments under the plan only if-

    (1) the debtor's failure to complete such payments is due to circumstances for which the debtor should not justly be held accountable;

    (2) the value, as of the effective date of the plan, of property actually distributed under the plan on account of each allowed unsecured claim is not less than the amount that would have been paid on such claim if the estate of the debtor had been liquidated under chapter 7 of this title on such date; and

    (3) modification of the plan under section 1329 of this title is not practicable.

(c) A discharge granted under subsection (b) of this section discharges the debtor from all unsecured debts provided for by the plan or disallowed under section 502 of this title, except any debt-

    (1) provided for under section 1322(b)(5) of this title; or

    (2) of a kind specified in section 523(a) of this title.

(d) Notwithstanding any other provision of this section, a discharge granted under this section does not discharge the debtor from any debt based on an allowed claim filed under section 1305(a)(2) of this title if prior approval by the trustee of the debtor's incurring such debt was practicable and was not obtained.

(e) On request of a party in interest before one year after a discharge under this section is granted, and after notice and a hearing, the court may revoke such discharge only if-

    (1) such discharge was obtained by the debtor through fraud; and

    (2) the requesting party did not know of such fraud until after such discharge was granted.

(f) Notwithstanding subsections (a) and (b), the court shall not grant a discharge of all debts provided for in the plan or disallowed under section 502, if the debtor has received a discharge-

    (1) in a case filed under chapter 7, 11, or 12 of this title during the 4-year period preceding the date of the order for relief under this chapter, or

    (2) in a case filed under chapter 13 of this title during the 2-year period preceding the date of such order.

(g)(1) The court shall not grant a discharge under this section to a debtor unless after filing a petition the debtor has completed an instructional course concerning personal financial management described in section 111.

    (2) Paragraph (1) shall not apply with respect to a debtor who is a person described in section 109(h)(4) or who resides in a district for which the United States trustee (or the bankruptcy administrator, if any) determines that the approved

instructional courses are not adequate to service the additional individuals who would otherwise be required to complete such instructional course by reason of the requirements of paragraph (1).

(3) The United States trustee (or the bankruptcy administrator, if any) who makes a determination described in paragraph (2) shall review such determination not later than 1 year after the date of such determination, and not less frequently than annually thereafter.

(h) The court may not grant a discharge under this chapter unless the court after notice and a hearing held not more than 10 days before the date of the entry of the order granting the discharge finds that there is no reasonable cause to believe that-

(1) section 522(q)(1) may be applicable to the debtor; and

(2) there is pending any proceeding in which the debtor may be found guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the kind described in section 522(q)(1)(B).

( Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2650 ; Pub. L. 98–353, title III, §532, July 10, 1984, 98 Stat. 389 ; Pub. L. 101–508, title III, §3007(b)(1), Nov. 5, 1990, 104 Stat. 1388–28 ; Pub. L. 101–581, §§2(b), 3, Nov. 15, 1990, 104 Stat. 2865 ; Pub. L. 101–647, title XXXI, §§3102(b), 3103, Nov. 29, 1990, 104 Stat. 4916 ; Pub. L. 103–394, title III, §302, title V, §501(d)(38), Oct. 22, 1994, 108 Stat. 4132 , 4147; Pub. L. 109–8, title I, §106(c), title II, §213(11), title III, §§312(2), 314(b), 330(d), title VII, §707, Apr. 20, 2005, 119 Stat. 38 , 53, 87, 88, 102, 126.)